**WEST COAST MEDIA, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**John B. Musselman, Jonathan D. Lewis, Intervenors.**

**No. 81–1548.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 16, 1982.

Decided Dec. 7, 1982.

---

**59.** See Fed.R.Civ.P. 52(a).

Eric L. Bernthal, Washington, D.C., with whom Mania K. Baghdadi, Washington, D.C., and Donald B. McCann, Cleveland, Ohio, were on the brief, for appellant. David Tillotson, Washington, D.C., also entered an appearance for appellant.

L. Andrew Tollin, Counsel, F.C.C., Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

Anne B. Roberts, Beverly Hills, Cal., with whom Charles M. Firestone, Beverly Hills, Cal., was on the brief, for intervenors.

Before MIKVA and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Appellant West Coast Media (West Coast) appeals the Federal Communication Commission's denial of the license renewal for its radio station. The intervenors are two residents of the station's listening area who initially filed the petition to deny. This appeal follows FCC denial of a petition for reconsideration, in which the FCC rejected the arguments now before this court. We affirm.

## BACKGROUND

In 1970, a group of business people with no broadcast experience formed West Coast Media, Inc. ("West Coast"), and purchased an FM radio station in Orange County, California. Roughly six months later, West Coast acquired a second FM station, KDIG in San Diego. Severe financial difficulties beset West Coast almost immediately, and its principal, McCann, decided to infuse large amounts of capital and tighten the operations. Pursuant to the latter goal, West Coast filed an amendment to the pending renewal applications for both stations in December 1971 ("1971 Amendment").

The 1971 Amendment requested relief from the stations' earlier programming promises. McCann described his financial problems and told the Commission that "a substantial reduction (or elimination) of time proposed to be devoted to News, Public Affairs and other [nonentertainment] programs" was necessary to keep the stations viable. Accordingly, McCann made the following promises:

(a) As a temporary matter, KDIG will broadcast only *0%* news, *1.1%* public affairs, and *0%* other non-entertainment programming.

(b) That programming will not be supplied by acquiring tapes from other producers.

(c) Competent personnel will aggressively report and take editorial positions concerning the community's problems.

(d) One staffer will search the community, investigate stories, and prepare three five-minute public affairs programs each day, seven days a week.

(e) "[I]t is intended that *well before* the next license renewal time [KDIG] will be devoting more than just an adequate or minimum of time to news, public affairs, religious and instructional types of programs . . . ."

(emphasis added). 79 F.C.C.2d 625, 627–28 (1978). In July 1972, the Commission approved the 1971 Amendment, noting its expectation "that increased programs will be broadcast during the coming renewal period year consistent with the proposal." *Id.*

When West Coast applied for the renewal of KDIG's license in July 1974, two residents of the listening area represented by a public interest group filed a petition to deny with the FCC. In response to that petition, the FCC designated four issues for a hearing: (i) promise-versus-performance, (ii) whether KDIG's non-entertainment programming was responsive to community needs, (iii) some claimed technical violations, and (iv) whether, in light of the other issues, renewal would be in the public interest. 61 F.C.C.2d 577, 585 (1976). The FCC placed the burden of proof on each of these issues on the licensee. The Commission denied a motion by intervenors to enlarge the

designated issues to include whether West Coast had made misrepresentations to the FCC.

The ALJ found that: (1) due to KDIG's negligence, the record of its programming over the license term was inadequate to carry the burden of proof on the promise-versus-performance issue (KDIG had lost most of its program logs); (2) even under its own representations, KDIG had fallen substantially short of its program commitments; (3) the station's financial difficulties did not excuse its non-compliance; (4) West Coast failed to carry its burden of proving that its programming responded to community needs; (5) the public interest would not be served by renewal "[i]f further performance is to be surmised solely from past performance." 79 F.C.C.2d 625, 640–645 (1978). The ALJ decided, however, that West Coast would obtain a "short-term" (one year) renewal because its failures resulted from the inexperience of its principals, and in the future such "misjudgments are less likely to occur." *Id.* at 645.

On appeal, the Commission adopted most of the ALJ's findings and conclusions. It concluded, however, "that the record indicates the licensee made initial proposals to the Commission which it did not then intend to effect, that with the passage of time the licensee did not make sincere efforts to carry out its proposals, and that it did not convincingly demonstrate that resources were not available to allocate to non-entertainment." 79 F.C.C.2d 610, 621–22 (1980). The Commission decided that there was "simply no justification to give the inexperienced broadcasters the advantage of performing below minimal renewal standards for a license term without suffering the same consequences that experienced broadcasters would incur." *Id.* at 622. Accordingly, the Commission denied renewal. It also agreed with the ALJ that West Coast had not responded to community needs, but expressly refused to rely on that ground in denying renewal. West Coast submitted a petition for reconsideration which the FCC

rejected. 86 F.C.C.2d 331 (1981). Both FCC decisions were unanimous.

Appellant makes three arguments in this appeal. First, appellant contends that the FCC conclusion that West Coast never intended to fulfill its promises constitutes, in essence, a finding that West Coast was guilty of misrepresentation. Because the FCC had not designated misrepresentation as an issue, petitioner claims the FCC deprived it of notice and the opportunity to be heard. Appellant's second claim is that the Commission failed to follow or distinguish its own precedent in two respects: (i) by not accepting West Coast's financial difficulties as an excuse for the company's programming shortfalls and (ii) by not imposing a sanction less severe than license non-renewal. Finally, petitioner contends the Commission's conclusions regarding West Coast's "good faith" were not supported by substantial evidence.

### DISCUSSION

#### A. *Was West Coast deprived of notice?*

The Communications Act,[1] the Administrative Procedure Act,[2] and the due process clause require the FCC to designate the issues to be considered in a renewal hearing. The purpose of designating issues is to provide a licensee adequate opportunity to rebut charges made against it. West Coast argues that the Commission deprived it of this opportunity in making two conclusions: (i) that West Coast "never intended" to fulfill its 1971 programming promises, and (ii) that certain aspects of KDIG's 1974 renewal application were "inherently misleading." West Coast claims that these conclusions amounted to a finding that the licensee engaged in "misrepresentation" (a specific intent to deceive), which was not a designated issue. We disagree.

The FCC described its inquiry on the promise-versus-performance issue as follows: "To determine whether West Coast Media, Inc., made *reasonable and good faith* efforts to carry out its non-entertainment proposal as set forth in its 1971 application

---

**1.** 47 U.S.C. § 309(e) (1976).

**2.** 5 U.S.C. § 554(b)(3) (1976).

for renewal of license...." 61 F.C.C.2d 577, 585 (emphasis added). Inquiry into a licensee's good faith does not only involve examination of the fruits of the licensee's labors. It may also examine the licensee's efforts, and the conscientiousness of those efforts. *See KORD, Inc.,* 31 F.C.C. 81 (1961); *Rust Communications Group, Inc.,* 53 F.C.C.2d 355 (1975). The latter may be particularly important where the Commission finds a discrepancy between the licensee's promises and its performance, as it did in this case.

■ In the instant case, however, the FCC examined not only appellant's state of mind in meeting its proposals, but its state of mind in making those proposals as well. It concluded that appellant had no intention of meeting its proposals even at the time they were made. Because those proposals were made for the benefit of the FCC, an intention not to meet them closely resembles an intent to deceive the FCC, which is at the heart of misrepresentation cases. Such intentions should not be discussed by the Commission in the absence of a designated misrepresentation issue. The FCC's reference to appellant's intent when making the programming proposals was imprudent.

Under the circumstances of this case, however, appellant's burden to establish its good faith makes it difficult to see how the FCC's conclusions deprived appellant of notice. Wide discrepancies existed between the licensee's proposals and its performance from the outset.[3] From the very beginning of the period, the licensee failed to "commit the personnel and resources necessary to carry out [the] programming promises,"[4] and offered little evidence of factors that would excuse these shortfalls.[5] In light of this extremely poor showing, the FCC questioned the licensee's sincerity in making the proposals.

Appellant's claim that he was harmed by lack of notice tries to turn the FCC's analysis on its head. The Commission's state-

ments about the licensee's intent were characterizations of the weakness of the licensee's explanation of its programming shortfalls. The FCC's decision in this case does not reflect lack of notice by the licensee: instead, it reflects the licensee's difficulty in explaining egregious discrepancies between programming proposals and efforts to meet them. Although the Commission was imprudent in its language, we cannot agree that appellant was harmed by lack of notice.

On petition for reconsideration, moreover, the FCC explicitly addressed West Coast's concern that the agency found it guilty of misrepresentation. The agency stated:

> To the extent our Decision referred to the licensee's intent, we did not mean to suggest that our inquiry focused on anything but the licensee's reasonable and good faith efforts to adhere to its promises.... We underscore that our Decision rested on findings of West Coast's lack of reasonable and good faith efforts to fulfill its commitments, and not on findings of misrepresentation.

86 F.C.C.2d at 334, 335 (footnote omitted). Given this explication, it would serve no purpose to send this case back to the FCC for a clearer statement of the basis of its decision.

### B. *FCC precedents.*

■ Although an agency has flexibility to reexamine its previous holdings, such changes must be rationally and explicitly justified. *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade,* 412 U.S. 800, 806–09, 93 S.Ct. 2367, 2374–75, 37 L.Ed.2d 350 (1973); *Office of Communication etc. v. FCC,* 560 F.2d 529, 532 (2d Cir.1977). This requirement ensures "that the standard is being changed and not ignored, and ... that [the agency] is faithful and not indifferent to the rule of law." *Columbia Broadcasting System, Inc. v. FCC,* 454 F.2d 1018, 1026 (D.C.Cir.1971). If a change in policy is explained, however,

---

3. 79 F.C.C.2d 610, 618 (1980).

4. *Id.* at 619.

5. *Id.* at 619; 79 F.C.C.2d 625, 644.

our review is limited to whether the basis of the change was so unreasonable as to be arbitrary and capricious. *Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C. Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). West Coast contends that the FCC failed to observe or distinguish precedent in two respects: 1) by not excusing West Coast's programming shortfalls in light of its financial difficulties, and 2) by applying the sanction of nonrenewal in the absence of a finding of misrepresentation.

### 1. *Financial difficulty.*

Petitioner relies heavily on *Hubbard Broadcasting, Inc.,* 41 R.R.2d 979 (1977), to establish a "longstanding" FCC policy that financial difficulties excuse programming shortfalls. That policy, according to petitioner, rests on the FCC's premise that the public interest is served by allowing "infant" stations to reduce non-entertainment programming until their financial position improves.

■ We cannot agree that *Hubbard* controls this case.[6] More importantly, however, the FCC did not ignore that case. It distinguished that opinion in both its original decision and on petition for reconsideration. Those distinctions were eminently reasonable. Unlike *Hubbard,* the record in this case established that KDIG was losing money when West Coast acquired it and when it made its programming promises. The programming promises were made in light of and despite those losses. No showing of a dramatic worsening of the financial situation was made.

In addition, the record suggested that KDIG programming suffered because of deliberate neglect by its owners in favor of another station. This situation was absent in *Hubbard.* In light of that evidence, the Commission required that West Coast make a "station-specific" showing that uncontrollable financial problems at KDIG justified the programming shortfall.[7] No such proof was provided, partly because of the inadequacy of appellant's own record-keeping. Appellant maintains that overall losses for West Coast should be sufficient. We do not agree. The FCC's licensing scheme requires each station to serve the needs of its city of license. The owners of KDIG disserved the citizens of San Diego while they devoted their resources to a station in a different city. It was reasonable for the FCC to conclude that West Coast could only meet its burden by showing the nature of losses experienced by KDIG as a single entity.[8]

### B. *Sanction.*

This case is apparently the first time a license renewal has been denied solely because of a promise-versus-performance failure. Such derelictions in the past have been remedied through fines or short-term renewals. West Coast argues that the Commission did not convincingly explain its decision to impose such a severe sanction.

■ Appellant relies heavily on *Steadman v. SEC,* 603 F.2d 1126 (5th Cir.1979), *aff'd,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69, *rehearing denied,* 10 S.Ct. 2008 (1981). That decision required the SEC to provide

---

6. *Hubbard* and the other cases cited by appellant, *Loudon County Broadcasting Co.,* 4 F.C.C. 188, *recon. denied,* 5 F.C.C.2d 13 (1966); *Northwest Broadcasters,* 3 F.C.C.2d 571, 572 (1966), do not establish that programming shortfalls will necessarily be excused if financial difficulties are found. At most, they establish that when good faith efforts are made, and the actual programming is not wholly inadequate, financial difficulties may excuse deviations of programming from proposals. The Commission did not· depart from this policy in this case.

7. In *Hubbard,* the court stated that "[a] review of the financial information discloses a full and open assessment of [the station's] financial condition as it related to its ability to support non-entertainment programming." 41 R.R.2d 987.

8. The Commission concedes that KDIG may have been losing money throughout the license term. 79 F.C.C.2d 610, at 620 (1980). Without specific data concerning KDIG's financial situation, however, the Commission could not determine the magnitude of those losses, and whether they were the result of irresponsible allocation of resources between the two stations.

compelling justification for its decision to impose "the most potent weapon in the Commission's 'arsenal of flexible enforcement powers.'" *Id.* at 1139. This case differs from *Steadman* because of differences in the regulatory schemes at issue. *Steadman* involved the Commission's decision permanently to bar an investment adviser from further practice of his trade. In FCC license renewal cases, in contrast, the FCC is required to make an affirmative finding that the public interest will be served by granting the license. As Judge Mikva recently explained:

> [There are] emphatic differences between a broadcast applicant before the FCC and one who faces the possibility of punishment.... [D]enial of a renewal application "is not a penal measure." .... [T]he FCC's purpose is not to punish licensees for past wrongs, but to ensure that these "fiduciaries of a great public resource" will "satisfy the highest standards of character commensurate with the public trust that is reposed in them."

*RKO General, Inc. v. FCC,* 670 F.2d 215, 232 (D.C.Cir.1981). This court has often emphasized that in a renewal proceeding, an incumbent licensee "must literally 'run on his record.'" *United Church of Christ v. FCC,* 359 F.2d 994, 1007 (D.C.Cir.1966). In this case, the ALJ concluded that "[s]tated simply, the station failed to operate fully in the public interest...." [9] The ALJ tempered his remedy because of the licensee's inexperience. The Commission explicitly disagreed with this justification for leniency, and offered a full explanation of why denial was appropriate.

Finally, it should be noted that courts give considerable deference to FCC discretion concerning the appropriate sanction to apply to licensee misconduct. *FCC v. WOKO, Inc.,* 329 U.S. 223, 228–29, 67 S.Ct. 213, 215–16, 91 L.Ed. 204 (1946); *Lorain Journal Co. v. FCC,* 351 F.2d 824, 831 (D.C.Cir.1965), *cert. denied sub. nom. W.W.I.Z., Inc. v. FCC,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). "[T]he Commission is [not] bound ... to deal with all cases at all times as it has dealt with some that seem comparable." 329 U.S. at 228, 67 S.Ct. at 215. Given that discretion we cannot say the sanction was inappropriate in this case.

### C. *Substantial evidence.*

Appellant's final claim is that the Commission did not have substantial evidence to support its finding that West Coast did not make good faith efforts to meet its programming proposals. The licensee had the burden of proof on this issue and the Commission determined that West Coast failed to carry that burden in light of, *inter alia,* the following evidence:

—KDIG's actual non-entertainment programming was virtually zero throughout the term and was never close to what it had promised.

—West Coast poured resources and staff into its Orange, Calif. station at the expense of KDIG, reducing the staff at KDIG to three, and thereby making it virtually impossible to comply with its programming promises.

—West Coast's principal acknowledged he was unaware of the nature of KDIG's programming during most of the term.

—The station employees charged with developing public affairs programming neither saw the station's ascertainment survey nor were told of its results.

—"only as renewal time approached was any effort made to provide a trained employee for the full-time production of non-entertainment programming."

We cannot say the Commission's conclusion was unsupported or arbitrary or capricious.

*Affirmed.*

---

9.  79 F.C.C.2d 625, 644 (1978).