**Eric G. HALL and Hall Enterprises, Inc., Appellants,**

v.

**Ann D. McLAUGHLIN, Secretary of Labor, Appellee.**

No. 87–5322.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1988.

Decided Jan. 13, 1989.

Patrick J. Cole, Washington, D.C., for appellants.

Frank P. Buckley, U.S. Dept. of Labor, of the bar of the Supreme Court of Massachusetts, pro hac vice, by special leave of court, with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence, and James N. Owens, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. Joseph E. diGenova, U.S. Atty.,* and Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., also entered appearances for appellee.

Before WALD, Chief Judge, and STARR and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

* At time of appearance.

WALD, Chief Judge:

Appellant Eric Hall, a Pakistani national, is a founder and corporate president of appellant Hall Enterprises, Inc. Hall Enterprises in 1982 applied to the Secretary of Labor (the "Secretary") for "labor certification," which entails a determination that the employment of an alien—in this case, the continued employment of Eric Hall as corporate president—would not displace qualified available domestic workers and would not adversely affect the market for domestic labor. Had the Secretary granted labor certification, Eric Hall would have become eligible for an immigrant visa, *i.e.*, a visa authorizing permanent residence in the United States. Without labor certification, his continued presence in the United States is subject to successive extensions of the nonimmigrant visa he now holds.

The Secretary denied labor certification on the premise that Eric Hall and Hall Enterprises are effectively one and the same, so that no genuine employment relationship exists. The lack of a genuine employment relationship, the Secretary held, brings Eric Hall under a regulation prohibiting the grant of labor certification to any alien who works for himself. Appellants' challenge to the Secretary's decision was dismissed by the district court. Appellants seek reversal of the district court's order, claiming that the Secretary acted arbitrarily and capriciously in finding the absence of a genuine employment relationship. Because we find that the Secretary's application of her regulations was rational and consistent with prior labor certification decisions, we affirm the district court.

## I. BACKGROUND

### A. *Statute and Regulations*

Section 212 of the Immigration and Nationality Act, 8 U.S.C. § 1182 (the "Act"), provides that several enumerated classes of aliens are to be denied visas and excluded from the United States. Among these are aliens seeking to enter the country for the purpose of performing skilled or unskilled labor, unless the Secretary grants labor certification to a particular alien based on criteria set out in the statute. *Id.* § 212(a)(14), 8 U.S.C. § 1182(a)(14). Specifically, the Act provides that labor certification is not to be granted unless the Secretary certifies that—

> (A) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of aliens who are members of the teaching profession or who have exceptional ability in the sciences or the arts), and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

*Id.* If labor certification is denied, the alien is subject to exclusion from the United States unless he can obtain a visa on some other grounds. *Id.*[1] If labor certification is granted, the alien not only is removed from the class of excludable aliens but also becomes eligible for an immigrant visa. 8 U.S.C. § 1153(a)(6). By law, a certain number of immigrant visas are allotted annually to each country of origin. 8 U.S.C. § 1152(a). An alien to whom labor certification is granted becomes a "sixth-preference" alien, or, for a narrow category of professionals and exceptionally talented persons, a "third-preference" alien. 8 U.S.C. § 1153(a)(3), (a)(6). The "sixth preference," which Eric Hall seeks, means five other categories of aliens are further ahead in line for the allocation of immi-

---

**1.** Although the absence of labor certification appears in the statute (along with insanity, drug addiction, polygamy and numerous other categories) as a ground for "exclusion" from the United States, 8 U.S.C. § 1182(a), the record does not indicate that Eric Hall is imminently threatened with deportation. It appears from the record that his entry into the United States and his continued residence here are lawful under the terms of his nonimmigrant "E–2" visa. *See infra* p. 870. In practical operation at least, the labor certification process serves not as a means of excluding otherwise admissible aliens but rather as a means for aliens to qualify for permanent resident status. *See* R. Steel, *Steel on Immigration Law* § 11:9 (1985).

grant visas to aliens originating from a given country. 8 U.S.C. § 1153(a).

The Secretary has promulgated regulations to govern the labor certification process in general and specifically to implement the worker availability standard. 20 C.F.R. Part 656 (1988). Under the regulations, an application indicating a genuine employer-employee relationship receives entirely different treatment from that accorded an application arising from circumstances deemed to constitute self-employment.

An application for certification is to be filed by an employer seeking to employ a particular alien. 20 C.F.R. § 656.21(a). The application must contain, among other things, a job description setting minimum qualifications; the qualifications must meet certain requirements and must not be unduly restrictive. *Id.* § 656.21(b)(2). In a case not involving self-employment, processing of the application begins with a determination by the Secretary, on the basis of general labor market data, as to the availability of qualified domestic workers for the job. If the data indicate that none are available, certification must be granted. *See Production Tool Corp. v. Employment and Training Admin.*, 688 F.2d 1161, 1170 (7th Cir.1982); *Acupuncture Center of Washington v. Dunlop*, 543 F.2d 852, 858–60 (D.C.Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78 (1976); 20 C.F.R. 656.24(b)(2)(ii)-(iv). If it is determined that qualified workers are likely to be available locally, the employer must engage in recruitment efforts, in cooperation with the local job service office, to determine whether any of those workers are willing to take the job opportunity. 20 C.F.R. §§ 656.21(f), 656.21(g), 656.-24(b)(2)(i). If qualified United States workers do apply for the job, the applicant alien is denied labor certification; if not, the alien merits certification.

Where a genuine employer-employee relationship is not present, a different set of rules applies and labor certification is denied outright in all cases. 20 C.F.R. §§ 656.20(c)(8), 656.50.[2] This *per se* rule barring certification for self-employed persons is applied not only to solo practitioners, but also to aliens who have an ownership stake in a corporation under circumstances deemed to amount to self-employment. The Secretary's rationale for the rule is that the best way to determine whether labor certification would harm United States workers is to require the employer to undertake a genuine effort to recruit a domestic worker. *See* Br. for Appellee 11–16. Self-employment, in the Secretary's view, offers no opportunity for genuine recruitment. The Secretary posits that under certain circumstances (the exact nature of which we discuss, *infra* Part II), a corporation that applies for certification on behalf of an alien who is its part-owner cannot be expected to make a serious effort to replace the alien with a United States worker. The present case concerns the application of the self-employment regulations to an alien who is not self-employed in the solo sense but is part-owner of the business enterprise that applied for certification on his behalf.

## B. *Facts and Prior Proceedings*

Eric Hall, a Pakistani national, currently resides in the United States under an E–2 visa, which is a form of nonimmigrant visa that permits an alien to come to the United States to develop and direct the operations of a business enterprise in which he has invested a substantial amount of capital. 8 U.S.C. § 1101(a)(15)(E)(ii). Continued residence in the United States under an E–2 visa requires that the alien periodically obtain an extension of his visa from the Immigration and Naturalization Service. 8 C.F.R. § 214.2(e) (1988). Although extensions are routinely granted and E–2 status is

**2.** In the language of the regulations, the employer's application for certification must clearly show that the "job opportunity has been and is clearly open to any qualified U.S. worker." 20 C.F.R. § 656.20(c)(8). The term "job opportunity" is defined as "a job opening for employment at a place in the United States to which U.S. workers can be referred." 20 C.F.R. § 656.50. "Employment," in turn, is defined as "permanent full-time work by an employee for an employer other than oneself." 20 C.F.R. § 656.50.

therefore considered nearly as desirable as permanent resident status,[3] Eric Hall now seeks an immigrant visa which would confer permanent resident status.

Eric Hall and his wife Marjorie established Hall Enterprises in August 1982, incorporating it under the laws of Maryland. Initially, each of the Halls owned 50 percent of the stock. The company is engaged in the business of importing and exporting Pakistani furniture, giftware and military spare parts. On December 12, 1982, Eric Hall sold 490 of his 500 shares of Hall Enterprises stock to Joseph J. Bernot, retaining an option to repurchase under certain conditions. Two weeks later, on December 29, 1982, Hall Enterprises applied for labor certification for Eric Hall, who was already serving as corporate president.

A Labor Department certifying officer denied certification on March 13, 1985. The certifying officer found that there was no job opportunity clearly open to United States workers as the regulations require; no employer-employee relationship truly existed, in that the alien controlled the corporation that had declined to supplant him with a United States worker. The certifying officer based these findings on the presence of family members (including Eric Hall) in the corporate structure, the Hall family's ownership of 51 percent of the stock, the transfer of most of Eric Hall's stock just two weeks prior to the application for certification, and the premise that Eric Hall's position as president made it unlikely that he would be replaced by a qualified United States worker. Appellants' Appendix ("A.A.") 64–66.

An administrative law judge ("ALJ") affirmed the certifying officer's decision on substantially the same grounds. A.A. 68–70. The ALJ cited the rule prohibiting self-employment, 20 C.F.R. § 656.50, and continued as follows:

> Although it is generally recognized that a corporation is an entity separate and distinct from its officers, directors and shareholders, if the corporation is in fact the alien, then certification cannot be

granted. *Marriott Farms, Inc.*, 4 ILCR 1–362 (1982).

> In this case, the corporation was created by the alien as [a] vehicle for his business. Judging by the extensive business travel report which is in the record, the corporation relies heavily if not entirely upon the talents, skills, and personal business connections of the alien. It is his expertise that has given direction and life to the corporation and without the alien as president, it is likely the corporation would cease to exist.

> I do not find any indication of fraud or evidence that the corporation is a sham developed solely to enable the alien's certification. However, I do find the corporation and the alien to be the same person for purposes of this Act and do not find the proper employer/employee relationship. Since no such relationship exists, I find the job was not actually open to U.S. workers and, therefore, deny certification.

A.A. 70.

Eric Hall and Hall Enterprises sought relief in the district court, asserting that the Secretary had acted arbitrarily and capriciously. The district court upheld the Secretary's denial of certification.

### C. *Issues Under Review*

Appellants challenge the Secretary's determination that the relationship between Eric Hall and Hall Enterprises did not constitute genuine "employment," within the meaning of 20 C.F.R. § 656.50. They allege that the Secretary acted arbitrarily and capriciously in finding that Eric Hall did not work "for an employer other than [him]self." We undertake our review of the Secretary's action using the "arbitrary or capricious" test embodied in the Administrative Procedure Act § 10(e)(2)(A), 5 U.S. C. § 706(2)(A). *See Acupuncture Center of Washington v. Dunlop*, 543 F.2d at 859; *Pesikoff v. Secretary of Labor*, 501 F.2d 757, 761 n. 5 (D.C.Cir.), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974).

---

**3.** *See* R. Steel, *supra* note 1, § 3:9.

At the administrative level, the appellants did not challenge the regulations' insistence upon an "employment" relationship. *See* Administrative Record ("A.R.") 9–17 (Hall Enterprises' brief before the ALJ). Thus we need not decide the question of whether the blanket denial of labor certification to all self-employed aliens rests on a permissible interpretation of the Immigration and Nationality Act. We address only the Secretary's application of her self-employment rule to Eric Hall and Hall Enterprises.

## II. FIDELITY TO ADMINISTRATIVE PRECEDENT

The appellants' main argument is that the Secretary's application of the self-employment rule was inconsistent with prior labor certification decisions. Before the ALJ, they cited *Richard's Custom Autos,* 5 ILCR 1–218 (1983), and *Cohen–Verdi, Inc.,* 3 ILCR 1–887 (1982), for the proposition that an alien's partial ownership of the employer corporation does not indicate the absence of an "employment" relationship so long as the corporation is not "a sham or scheme for obtaining the alien's labor certification." *Richard's Custom Autos,* 5 ILCR at 1–220. In the present case, as appellants correctly point out, the ALJ found that Hall Enterprises was not a sham developed solely to obtain certification. A.A. 70. We do not, however, believe that the Secretary's prior decisions mandate a finding of "employment" in every case where the corporation is not a sham.

### A. *Requirement of Consistency in Agency Actions*

■ Reasoned decisionmaking requires treating like cases alike; an agency may not casually ignore its own past decisions.[4] Divergence from agency precedent de-

mands an explanation. Judge Leventhal, in *Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), provided the classic direction for a reviewing court:

> [A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.

*Id.* at 852 (citations omitted). *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983); *Professional Airways Systems Specialists v. FLRA,* 809 F.2d 855, 859–60 (D.C.Cir.1987).

But, of course, an agency runs the risk of intolerable muteness only when it "glosses over or swerves from" its precedents. Where the reviewing court can ascertain that the agency has not in fact diverged from past decisions, the need for a comprehensive and explicit statement of its current rationale is less pressing. Thus, in other equally perceptive words of Judge Leventhal—

> [i]f satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned, though of course the court must not be left to guess as to the agency's findings or reasons.

*Greater Boston Television,* 444 F.2d at 851 (citations omitted); *see Union Mechling Corp. v. United States,* 566 F.2d 722, 725 (D.C.Cir.1977). *See also Apex Oil Co. v. Federal Energy Admin.,* 443 F.Supp. 647,

---

4. It would appear that, despite some ambiguity in the Secretary's counsel's answers at oral argument on the point, the Department of Labor recognizes the need for consistency in its certification decisions. The Department recently established a Board of Alien Labor Certification Appeals, replacing a system in which ALJs operated independently of each other. *See* Labor Certification Process for the Permanent Employment of Aliens in the United States; Establishment of Board of Alien Labor Certification Appeals, 52 Fed.Reg. 11,217 (1987). The Department noted at the time that, "[w]hile the decisions of the Administrative Law Judges, by and large, have been of high quality, the Board will enhance uniformity and consistency of decisions." *Id.* at 11,217–18.

651 (D.D.C.1977) (*Greater Boston* test asks whether the agency's "change in the application of the established criteria was significant enough to require an explanation," and, *if so*, whether such an explanation was provided).

Thus, where a particular agency action does not appear to be inconsistent with prior decisions, the agency's explanation need not be elaborate. Two examples will illustrate the point.

In *United Municipal Distributors Group v. FERC,* 732 F.2d 202 (D.C.Cir. 1984), the petitioner argued on the basis of two prior FERC decisions that the Commission had not sufficiently explained why it had not severed the uncontested portions of a rate increase settlement from the contested portions for the purpose of entertaining the petitioner's challenge to certain aspects of the multiparty settlement. On review, however, we found that the circumstances of the prior cases were sufficiently different from those of the case before us that the Commission was justified in declining to follow them, even though its explanation for taking a different course was simply that the settlement "represented an inseparable package." *Id.* at 211. Finding that this characterization was adequately supported in the record, the court accepted the Commission's laconic explanation as an "ample" articulation of its reasoning. *Id.*

Similarly, in *West Coast Media, Inc. v. FCC,* 695 F.2d 617 (D.C.Cir.1982), *cert. denied,* 464 U.S. 816, 104 S.Ct. 74, 78 L.Ed.2d 87 (1983), we held that the Commission had engaged in "eminently reasonable" decisionmaking when it distinguished an asserted precedent by merely reciting the factual differences between the prior case and the one before it. *Id.* at 621. The message is that if the court itself finds the past decisions to involve materially different situations, the agency's burden of explanation about any alleged "departures" is considerably less.

### B. Consistency of Application of Self-Employment Rule

■ So viewed, the decision of the Secretary in the present case—"though of less than ideal clarity"—must be upheld. We conclude that the Secretary did not "swerve" from her prior decisions. Consequently, her explanation need only be sufficient to permit the court to discern the path she has taken. The Secretary has met this burden.[5]

The appellants say that the present case is controlled by a line of prior decisions beginning with *Cohen–Verdi, Inc.,* 3 ILCR 1–887 (1982) and culminating in *Richard's Custom Autos,* 5 ILCR 1–218 (1983). These cases set out a two-part inquiry for determining whether a genuine "employment" relationship exists between the applying employer and the alien employee.

In *Cohen–Verdi, Inc.,* the Secretary denied labor certification on two grounds, one of which was the employer's failure to show that, in light of the alien applicant's part-ownership, the corporation was not "a sham and a scheme for obtaining the Alien's labor certification." *Cohen–Verdi, Inc.,* 3 ILCR at 1–889.[6]

Certification was also denied in *Marriott Farms, Inc.,* 4 ILCR 1–362 (1982), on the ground that a genuine employment relationship had not been established. This ruling was predicated on the ALJ's finding that—

> the alien has been the princi[pal] initiator of Marriott Farms, Inc. As such, the corporation has come to rely heavily upon the alien's skills and contacts so that, were it not for the alien, the corporation would probably cease to exist.

*Marriott Farms, Inc.,* 4 ILCR at 1–364–65. In *Cohen–Verdi* the ruling did not depend

---

5. We are not so troubled as our dissenting colleague by the inability of counsel for the Secretary, under questioning at oral argument, to describe more precisely the path set out by the Secretary's prior rulings. What ultimately matters is whether the reviewing court can discern an agency's course, not whether the agency's attorney provides a sufficiently detailed roadmap.

6. The other ground was the employer's failure to conduct a search for United States workers. *Id.*

on whether the alien had a symbiotic and inseparable relationship with the corporation; in *Marriott Farms* it did not depend on whether Marriott Farms was a sham and a scheme for obtaining certification.

The seminal ruling in *Richard's Custom Autos* blended these two tests, which for the sake of brevity we will label the "sham" and "inseparability" tests. In *Richard's Custom Autos,* the ALJ ordered the grant of labor certification. 5 ILCR at 1–220. Significantly, she relied on the criteria in both *Cohen–Verdi* and *Marriott Farms* for discerning the existence of a genuine employment relationship. She considered the facts in light of both tests and made the following two findings:

> [The employer] is an ongoing business that is not likely to cease to exist without the alien. The employer has *also* established that its corporate shell is not a sham or scheme for obtaining the alien's labor certification.

5 ILCR at 1–220 (emphasis added). Having concluded that both tests pointed to the presence of a self-employment relationship, the ALJ granted certification.

Under the line of cases culminating in *Richard's Custom Autos,* the alien must prevail on both tests in order to merit certification. The ALJ's use of the word "also" in the quoted passage makes this clear. The two prior cases are consistent with this analysis, since in both *Cohen–Verdi, Inc.* and *Marriott Farms, Inc.* the alien flunked one of the two tests and certification was denied. (In neither case was there a need to apply both tests, since failing either one precluded the alien from obtaining certification.)

Appellants here assert that the nonsham nature of Hall Enterprises entitles them to labor certification. Yet, as we have seen, both *Marriott Farms, Inc.* and *Richard's Custom Autos* impose an inseparability test. Only *Cohen–Verdi, Inc.* fails to mention the inseparability factor. The question therefore is whether the Secretary has im-

permissibly swerved from *Cohen–Verdi, Inc.* without indicating her rationale for the departure. We think not. To the extent that *Marriott Farms, Inc.* and *Richard's Custom Autos* do modify *Cohen–Verdi, Inc.* by adding an inseparability component to the sham test, the Secretary has adequately explained her rationale for doing so.[7] Just as a sham corporation could not be expected to make an independent determination of its need for the alien alter ego, neither could a bona fide corporation whose continued existence depends on the alien founder be expected to make a similar choice. The two situations are the functional equivalents of one another in that a genuine test of the labor market is unlikely in both instances. The citation of both *Cohen–Verdi, Inc.* and *Marriott Farms, Inc.* in *Richard's Custom Autos,* and the latter's use of both tests conjunctively, belie any contention that the Secretary "casually ignored" her own precedents.

Thus neither *Cohen–Verdi, Inc.* nor any other case brought to our attention has held that where the applicant corporation is *not* a sham, an employment relationship is conclusively established. *Cohen–Verdi, Inc.* stated that where a corporation *is* a sham, certification is to be denied. *Marriott Farms, Inc.* held that inseparability (also) defeats certification, and *Richard's Custom Autos* showed how the sham and inseparability tests work in tandem. The ALJ in this case employed both tests to decide if a true employment relationship was present.

Logic of course dictates that the two factors should be considered independently. The "sham" question determines only whether the corporation was fraudulently established for the sole purpose of obtaining certification for the alien. The "inseparability" question considers whether the corporation, even if legitimately established, relies so heavily on the pervasive presence and personal attributes of the alien that it would be unlikely to continue in operation without him. This latter ques-

---

7. *See Richard's Custom Autos,* 5 ILCR at 1–220 (linking inseparability factor to likelihood that corporation would fill position with U.S. worker). *See also Hall Enterprises, Inc.,* A.A. 70 (link-ing inseparability factor to need for employer to "make a good faith search of the job market to locate qualified U.S. workers to fill the position being offered to the alien").

tion is appropriate because a company that depends so heavily on the alien that it would probably shut down without him is unlikely to make any real choice between him and a "qualified" United States worker.

Our dissenting colleague contends that a finding of inseparability implies that there exist no "able, willing, qualified, ... and available" United States workers to fill the shoes of the alien. Dissent, *post*, p. 880 (quoting 8 U.S.C. § 1182(a)(14)(A)). If this were the meaning of "inseparability," then such a finding would indeed militate toward, rather than against, labor certification. We understand the Secretary's test differently, however. *Marriott Farms, Inc.* refers to the alien's role as the "princi[pal] initiator" of the corporation, without whose "skills and contacts" the corporation could not exist. 4 ILCR at 1–364–65. The ALJ in the instant case described Hall Enterprises as a business to which Eric Hall has "given direction and life" and which relies so heavily on his "talents, skills, and personal business connections" that "it is likely the corporation would cease to exist" without him. A.A. 70. Thus, the Secretary has employed the inseparability criterion to determine whether the alien is so personally indispensable to the corporation that it would shut down without him. The Secretary recognizes that such enterprises are so dependent on the "direction and life," as well as the connections, supplied by their founders that they would have no choice but to turn away even the most "able, willing, qualified, ... and available"

replacements. One would hardly expect "The Cosby Show" to replace Bill Cosby—even if Sidney Poitier were to apply for the job. Similarly (though on a less glamorous scale), the ALJ in this case concluded that Hall Enterprises would never displace its patriarch—even if a *qualified* United States worker were to submit his resume. That kind of inseparability test presents an entirely rational means of deciding whether a genuine determination of need for alien labor can be made by the employer corporation and whether a genuine opportunity exists for American workers to compete for the opening.[8]

Our colleague maintains, however, that there can be no distinction between an alien who is indispensable to his corporation and an alien for whose position no United States worker is "qualified." Dissent, *post*, p. 880. We are unpersuaded, primarily because we do not read the meaning of the statutory term "qualified" as our colleague does. While it is true that, in the example described above, no actor is *as qualified as* Bill Cosby, *see id.*, the statutory provision applicable to this case precludes the grant of labor certification if there exist "qualified" United States workers. That this means *adequately* qualified rather than *equally* qualified is demonstrated by the Act's express creation of an "equally qualified" test for teachers and persons with exceptional abilities in the arts or sciences. 8 U.S.C. § 1182(a)(14)(A). While a foreign-born Bill Cosby might well fit into this latter category, Eric Hall clearly does not.[9] Rather, Eric Hall falls under

---

8. We note in passing that the rationale of the inseparability test is similar to the rationale underlying one of the Secretary's regulations concerning labor certification. Under 20 C.F.R. § 656.21(b)(2), a corporation applying for labor certification cannot set "unduly restrictive job requirements" for the posted position. More specifically, absent a showing of "business necessity," the corporation cannot require United States job applicants to have qualifications other than "those normally required for the job in the United States," or to be proficient in a foreign language. *Id.* § 656.21(b)(2)(i). The purpose of this rule is to prevent the employer from "evading the congressionally mandated preference for U.S. workers by tailoring the job requirements to the alien's qualifications." *Posadas de Puerto Rico Assoc., Inc. v. Secretary of Labor,*

698 F.Supp. 396 (D.P.R.1988). The inseparability test applied in the *Marriott Farms* and *Hall Enterprises* cases likewise prevents employers from merely going through the motions of a search for United States workers. In the Secretary's view, if a corporation would not dream of firing its patriarch and hiring a United States worker in his stead, then its ostensible effort to find a replacement fails to satisfy the statutory requirements.

9. Indeed, the appellants share our understanding of the term "qualified." *See* Br. for Appellants at 17 ("[A]ny qualified U.S. worker presenting the *minimum* qualifications for the position disqualifies the alien beneficiary from immigration benefits.") (Emphasis in original.)

the regular "qualified" test. Were Hall Enterprises, moreover, to require that United States job applicants possess superlative business connections in Pakistan, such an extraordinary requirement would have to be supported by a showing of genuine "business necessity." 20 C.F.R. § 656.21(b)(2)(i); *see Kwan v. Donovan,* 777 F.2d 479, 482 (9th Cir.1985). Courts have often upheld the Secretary's use of the "business necessity" regulation to invalidate too specialized job requirements. *See, e.g., Kwan,* 777 F.2d at 480, 482 (Chinese language skills required for bookkeeper position in law office with predominantly Chinese clientele); *Oriental Rug Importers, Ltd. v. Employment & Training Admin.,* 696 F.2d 47, 49 (6th Cir.1982) (ten years' experience required for buyer position in import company). Thus, the inseparability and the "qualified" worker requirements serve distinct and separate ends. The inseparability test guarantees that a genuine decision will be made as to whether an enterprise needs the alien rather than a domestic worker; and the qualified worker requirement regulates how specifically tailored the employer's criteria can be.

Our colleague assails the inseparability test on still another ground, however: if the alien is inseparable from his corporation, does that not constitute a sufficient "business necessity" to keep him? *See* Dissent, *post,* p. 880. Although not without facial appeal, this argument too misses the mark. The Secretary's regulations are understandably geared to prevent the definitional collapse of the statutory term "qualified" to a word picture of a specific individual. Listed job requirements must be those found in the *Dictionary of Occupational Titles,* unless some more specialized attribute can be shown to be a "business necessity." 20 C.F.R. § 656.21(b)(2)(i)(B). And even "business necessity" means that some particular attributes are objectively needed to perform the work in question; it is not intended as a mask for the preselection of one individual. *See Kwan,* 777 F.2d at 482. The objectivity of a "business necessity" finding thus distinguishes it from the subjective nature of an inseparability finding, which depends on the unique relationship of the alien *to his company.*

True, the effect of the Secretary's interpretation may be to deny labor certification to some aliens whose skills are superior to those of United States workers. The dissenting opinion apparently assumes that this would contravene congressional intent. *See* Dissent, *post,* p. 880. Yet Congress itself indicated in 8 U.S.C. § 1182(a)(14)(A) that, given the choice between the employment of an adequately "qualified" United States worker and the employment of an even-better-qualified alien worker, it prefers the former; it was apparently willing to trade away some degree of increased productivity and economic efficiency in order to protect United States workers.[10]

This aside, our colleague's view of the functional equivalence between an individual who breathes life into his company and a uniquely "qualified" worker is defective in another respect. The dissenting opinion supplies no refutation to the Secretary's position that Eric Hall—by virtue of his indispensability to the future of Hall Enterprises—is in no danger of having his business associates decide to replace him and thus is effectively self-employed within the meaning of 20 C.F.R. § 656.50. Our colleague's insistence that there is no difference between the inseparability test and the statutory "qualified" requirement challenges at base § 656.50's rejection of self-employment as a basis for labor certification. While we, too, harbor some doubts about the basis for the self-employment ban, we note again that the appellants here failed totally to challenge its validity at the administrative level; that failure precludes

---

**10.** Congress decided in 1976 to stop making that tradeoff in the case of teachers and persons exceptionally skilled in the arts and sciences; thus the Act permits certification in those categories even if an adequately qualified, but not "equally qualified," United States applicant appears. 8 U.S.C. § 1182(a)(14)(A); H.R.Rep. No. 1553, 94th Cong., 2d Sess. 11 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6073, 6083. We note again, however, that Eric Hall is not subject to this "equally qualified" test.

us from entertaining such a challenge now, even if it were clear they were making one. We must assume the validity of § 656.50, and the Secretary's development of the sham/inseparability two-part inquiry appears a sensible interpretation of it.

The decision in *Hall Enterprises* fits into the Secretary's analytical framework without difficulty. The ALJ found that Hall Enterprises passed the sham test but failed the inseparability test. Because the applicant could not satisfy both parts of the inquiry, certification was denied. A.A. 70. Thus, there is no inconsistency with the *Richard's Custom Autos* line of cases. That *Hall Enterprises* does not cite *Richard's Custom Autos*, or that, in the view of our dissenting colleague, neither case sets out the two-part test with "ideal clarity," falls short of persuading us that the Secretary has failed to engage in reasoned decisionmaking.

Neither do we agree with appellant's contention that this case is indistinguishable from *Richard's Custom Autos*. In the present case, the ALJ found specific evidence indicating that the alien's inspiration and contacts were indispensable to the continued operation of the business. A.A. 70; *see infra* Part III. In *Richard's Custom Autos*, the ALJ found that the company would continue without the alien. So long as the Secretary's inseparability finding in the present case was supported by the record, we cannot fault the Secretary's failure to explicitly invoke and distinguish *Richard's Custom Autos*.

### III. EVIDENTIARY SUPPORT FOR THE ALJ'S DECISION

The decision in the present case not only comports with prior decisions of the Secretary; it is fully supported by the evidence contained in the record. The ALJ set out the basis for his finding of the alien's inseparability from the corporation.

In this case, the corporation was created by the alien as [a] vehicle for his business. Judging by the extensive business travel report which is in the record, the corporation relies heavily if not entirely upon the talents, skills, and person-

al business connections of the alien. It is his expertise that has given direction and life to the corporation. . . .

A.A. 70.

The record contains ample evidence from which the ALJ could have concluded that Eric Hall was once a prominent figure on the export-import scene in Pakistan whose United States corporation now trades heavily on his name and contacts. He was a Vice Marshal and Chief of Staff of the Pakistan Air Force for more than 30 years, and later was Director General of Civil Aviation for the Government of Pakistan. A.R. 110. For a year, he ran an export-import company in Karachi. *Id.* Judging from the job qualifications indicated on the Hall Enterprises labor certification form, he has "personal knowledge of Pakistani export regulations and procurement regulations, personnel and requirements." A.R. 106. He founded Hall Enterprises with his wife and serves as corporate president. When he sold most of his Hall Enterprises stock to a third party immediately before applying for labor certification, he reserved an option to repurchase. A.R. 24–25. Finally, the business travel report cited by the ALJ indicates that Eric Hall traveled to Pakistan in 1984 and made contact with 19 export-import officials and businessmen there. A.R. 111–20. Letters attached to the report illustrate the business goodwill generated by the visits. A.R. 121–27 (including two letters referring to "your excellent credentials"). We conclude that the ALJ's determination was supported by substantial evidence.

### CONCLUSION

Tenets of reasoned decisionmaking require an agency to justify any significant change in course. By contrast, where inquiry reveals that an agency action is consistent in discernible principle with prior rulings, a court must uphold the action so long as it is clear that the agency is traveling the same path and the path is a reasonable one. *Hall Enterprises* falls into the latter category of cases; while the road signs are not unambiguous, the agency's path is still discernible. The denial of labor

certification for Eric Hall was neither arbitrary nor capricious.

AFFIRMED.

WILLIAMS, Circuit Judge, dissenting:

I dissent because I believe that the majority's "two-part inquiry" for labor certification has never been developed by the Secretary of Labor. While the majority's reconciliation of the Secretary's meandering opinions might represent a sustainable view, the Secretary never adopted it. Under the *Chenery* principle we affirm only on an agency's statement of its views, not our own. See *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 *reh'g denied*, 332 U.S. 783, 68 S.Ct. 26, 92 L.Ed. 367 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action...."). I would remand the case to enable the Secretary to construct a coherent rule for certification of an alien claiming a prospect of employment by a corporation that he or she dominates.

The majority relies on two cases in which this court has accepted a "laconic" agency effort to reconcile arguably conflicting precedents. See Maj.Op. at 873. In the cases the majority cites, however, this court looked to the agency's reasoning, and did not substitute its own. In *United Municipal Distributors Group v. FERC*, 732 F.2d 202 (D.C.Cir.1984), for example, the court found the agency's *expressed* reasoning to be sufficient. It did not create previously unvoiced justifications for the agency, and in fact, on another claim of alleged deviation from precedent, specifically rejected FERC's suggestion that it do so. *Id.* at 211 n. 16. Similarly, in *West Coast Media, Inc. v. FCC*, 695 F.2d 617, 621 (D.C.Cir.1982), *cert. denied*, 464 U.S. 816, 104 S.Ct. 74, 78 L.Ed.2d 87 (1983), the court relied only on the agency's explicit distinction of potentially conflicting precedent. Moreover, for every case accepting a laconic explanation, there is probably one (maybe ten!) requiring more. See, e.g., *Consolidated Edison Co. of New York v. FERC*, 823 F.2d 630, 636–42 (D.C.Cir.1987) (rejecting as inadequate reasons offered by Federal Energy Regulatory Commission for change in "abandonments" policy).

Here, the ALJ's decision made no mention of *Richard's Custom Autos*, 5 ILCR 1–218 (1983), although the facts of that case appear difficult to distinguish. The majority's efforts to do this work for the ALJ slide from "discerning the [Secretary's] path" to cutting a new one.

Further, if the Secretary was indeed pursuing the route my colleagues have discerned, she was surprisingly remiss in concealing it from counsel who argued the case. The court questioned counsel directly about the administrative precedents, particularly *Richard's Custom Autos*, on three separate occasions. On each occasion he passed up the opportunity to articulate a reconciling test for ascertaining self-employment; instead he acknowledged that the decisions were "all over the place" and "different," and expressly asserted that the Department at the time had treated these decisions as having "no precedential value."[1] Instead, counsel simply

1. The exchanges at oral argument were as follows:

*The court:* What's the distinction between this case and *Bharadva* [*Richard's Custom Autos*] ...?

*A:* Your honor, that was a case ... by an ALJ before the amendment of the Department's regulations in 1987 which created a Board of Alien Labor Certification Appeals. Those decisions issued by individual ALJs had no precedential value and the cases were decided all over the place. As the result of that situation the regulations were amended in 1987 to create a Board of Alien Labor Certification Appeals to provide more consistency and uniformity in the decisions issued by the ALJs.

\* \* \* \* \* \*

*The court:* ... Does the fact that the Department never gave precedential effect to ALJ decisions—but I take it enforced them—excuse it the obligation to explain shifts in direction, inconsistent decisions? You say that the regulations in 1987 address this problem of inconsistency, and that's reassuring and nice, but your theory I take it is that prior to that there was no legal obligation on the part of the Department to secure consistency of adjudication?

maintained that the Department did not then conceive itself as having a duty to reconcile conflicting precedents. Today, it receives the pleasant news from the majority that it has been doing it unconsciously all along.

Even if the majority's two-part test could take the place of an analysis by the Secretary, its effort to justify the "inseparability" portion of the test does not seem to me to fit very happily with the statute or with the labor certification regulations of 20 C.F.R. Part 656. The statute requires the applicant to show that

(A) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of aliens who are members of the teaching profession or who have exceptional ability in the sciences or the arts), and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

Immigration and Nationality Act, § 212(a)(14), 8 U.S.C. § 1182(a)(14) (1982).

The Secretary has defined "employment" as "permanent full-time work by an employee for an employer other than oneself." 20 C.F.R. § 656.50 (1988). Significantly, the word "employment" appears *only* in subsection (B) of § 212(a)(14), so there is no need to define it at all for purposes of satisfying subsection (A); it has come to play a role, however, evidently because the Department has framed its regulations around an expectation that the applicant is headed toward work for some specific employer. See 20 C.F.R. Part 656 generally.

In any event, under the majority's explanation of how the Secretary addresses certification of aliens who are employed (and hope in the future to be employed) by a corporation over which they have substantial control, the alien must show (1) that the corporation is not a "sham" and (2) that he or she is not "inseparable" from the corporation. Maj.Op. at 873–77.

By way of explanation, the majority states that the Secretary has linked the inseparability test to the requirement that the employer make a good faith search for qualified American workers to fill the position being offered to the alien. See Maj.Op. at 874 n. 7 (citing *Richard's Custom Autos*, 5 ILCR at 1–218, 1–220 (1983), and *Hall Enterprises, Inc.*, Appellant's Appendix 68, 70). I am bound to say that I can find no suggestion of this link in the mere language of those cases. Concededly on its own, the majority offers a theory to support such a link: "[A] company that depends so heavily on the alien that it would probably shut down without him is unlikely to make any real choice between him and a 'qualified' United States worker." Maj.Op. at 875.

\* \* \* \* \* \*

*A:* Like I said, your honor, the ALJ decisions on similar issues were different and that was the reason why the regulations—

*The court:* My point is the spirit is admirable but there are a line of cases that go back a very long time of this court and others insisting on consistency of agency adjudication. I take it that what you are saying is that what excuses the apparent inconsistency is simply a settled policy that no effort would be made to achieve consistency.

*A:* I'd like to note, your honor, that decisions issued by the newly created Board of Alien Labor Certification Appeals are consistent with the decision in this particular case.

*The court:* Well, I don't think that quite resolves the problem.

*A:* This decision does reflect the position and the policy of the Department of Labor in cases of this particular kind.

*The court:* You don't seriously, I mean you haven't endeavored to reconcile this case with *Bharadva.* You concede at least a potential inconsistency, a probable inconsistency?

*A:* No, your honor, I don't concede any inconsistency whatsoever.

*The court:* What's the reconciliation?

*A:* I'm not thoroughly familiar with the facts of that particular case, your honor.

*The court:* It had more employees, that seems to be the big difference as far as I can tell looking at the *Bharadva* opinion.

*A:* I think it's more likely for a corporation to be able to get a certification in circumstances such as these if it does have more employees, if the corporation is larger, if the alien is not so indispensable to the interests of the corporation. But that is not the situation we have here.

In fact, the insistence on the alien's being dispensable seems to directly *defeat* the statutory purpose. Proof that a worker is indispensable would seem to satisfy § 212(a)(14)(A)'s requirement of a showing that "there are not sufficient workers in the United States who are able, willing, qualified, ... and available."

The majority's reconciliation, distinguishing between workers merely "qualified" for a task and ones who supply a corporation with "direction and life," Maj.Op. at 875, is not clear to me. To use their example, the fact that Bill Cosby is irreplaceable on the Cosby show surely demonstrates that there is no "worker" in the United States (or in the world) "qualified" to replace him. Moreover, satisfaction of the majority's inseparability test would surely entail satisfaction of the "business necessity" test of 20 C.F.R. § 656.21(b)(2)(i), assuming that to be applicable. *Cf.* Maj.Op. at 875–76. The oddity persists: the better the applicant satisfies the statutory standards, the more likely he is to be tripped up by the inseparability test.[2]

Nor, frankly, does the inseparability test seem to me to satisfy the majority's hypothesized purpose, even if we disregard its apparent inconsistency with the statute.

I fail to see why the inseparability of a worker should lead a worker-controlled firm to be more lax in its search for a substitute than it otherwise would be. The employment of the alien already supplies ample motive for lethargy, and control supplies ample means. But if the worker is indispensable, the firm can pursue a relentless search without great risk of discovering a replacement. Thus, while a control test would fulfill the majority's hypothesized purpose, and would fit 20 C.F.R. § 656.50's ban on self-employment (and perhaps the statute as well), inseparability seems not to. Certainly the Secretary has never explained how it would.

"Discerning the path" is inevitably a rather subjective task, and with two colleagues discerning one, I would normally attribute my inability to do so to my own lack of discernment. Here, I fear, the majority has hacked a path where the Secretary left only a jungle.

---

**2.** The Secretary's regulation prohibiting "unduly restrictive job requirements," 20 C.F.R. 656.-21(b)(2), see Maj.Op. at 875 n. 8, is manifestly directed to a different problem—artificial job requirements concocted to create a phonily unique position. No one suggests this is true of Hall. Nor is it suggested by the Secretary that the job attributes involved here are not "objectively needed to perform the work in question." Compare Maj.Op. at 876.