**TELEMUNDO, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Television Broadcasting Corporation, WPRV–TV, Inc., Intervenors.**

**No. 85–1494.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 29, 1986.

Decided Sept. 23, 1986.

Nicholas W. Fels, with whom Gregory M. Schmidt, Washington, D.C., was on the brief, for appellant.

Sue Ann Preskill, Counsel, F.C.C., with whom Jack D. Smith, General Counsel, and Daniel M. Armstrong, Associate General Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

John P. Bankson, Jr., with whom Neal M. Goldberg and Robert P. Fletcher, Washington, D.C., were on the brief, for intervenor Television Broadcasting Corp.

Eugene F. Mullin and Lawrence Roberts, Washington, D.C., were on the brief, for intervenor WPRV–TV, Inc.

Before STARR, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

This is an appeal from an order of the Federal Communications Commission ("FCC" or "Commission") approving the transfer of control of two television stations in Caguas and Ponce, Puerto Rico, to Television Broadcasting Corporation ("TBC").

Two issues are before us: First, whether there is a likelihood that the transfer will result in a *de facto* control by aliens over the stations' operations that is prohibited by law; and second, whether the FCC erred in permitting the two stations to operate in a parent-satellite relationship and, therefore, to remain under common ownership.

On reviewing the record, we find that the Commission gave full consideration to each of these concerns, and that its decision to approve the transfer was neither arbitrary, capricious, nor an abuse of discretion.

## I. BACKGROUND

This case involves the transfer of control of two Puerto Rican television stations, WSUR–TV (Channel 9) in Ponce and WKBM–TV (Channel 11) in Caguas, through the sale of their licensee, American Colonial Broadcasting Corporation ("ACBC"). WSUR–TV operated as a primary satellite station [1] of WKBM–TV from 1965 to 1981. In 1981, ACBC was forced into bankruptcy, and its Caguas and Ponce stations ceased operations.

Three years later, the bankruptcy court approved the sale of the corporation to TBC, *In re American Colonial Broadcasting Corp.*, No. B–81–00515–A (Bankr. D.P.R. Feb. 15, 1984), and the parties sought FCC approval of the proposed sale, as required by the Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.* (Supp.1986) ("Communications Act"). Section 310(d) of the Act states in pertinent part:

No ... station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.

Three parties, including appellant Telemundo, Inc., filed petitions to deny on the claim that TBC was precluded from assuming control of the stations on two grounds: First, TBC's corporate structure and operating plans violated the statutory prohibition against alien control of broadcast stations, 47 U.S.C. § 310(b)(4) (Supp.1986).[2] Second, because the two stations' reception or service areas overlapped, and because

---

1. Satellite stations transmit programs originated by their parents. They generally serve markets that are too small to support a full-scale operation. A "100% satellite station" broadcasts only the programming of its parent station, without originating any local programming. A "primary satellite station" originates some local programming, generally amounting to less than 5% of the weekly total.

2. Subsection (b)(4) states:
   (b) No broadcast ... license shall be granted to or held by—

\* \* \* \* \* \*

   (4) any corporation directly or indirectly controlled by any other corporation of which any officer or more than one-fourth of the directors are aliens, or of which more than one-fourth of the capital stock is owned of record or voted by aliens, ... if the Commission finds that the public interest will be served by the refusal or revocation of such license.

TBC's proposal to operate WSUR–TV as a satellite of WKBM–TV failed to meet the public interest criterion (*see* 47 C.F.R. § 73.3555, n. 5 (1985)), TBC was not exempt from the prohibition against common ownership of two television stations having overlapping service areas. *Id.* § 73.-3555(a)(3).[3]

The Commission's Mass Media Bureau ("the Bureau")[4] agreed with petitioners that TBC's original application was improper as TBC's alien ownership exceeded, in the aggregate, the statutory limit of 25%. *See* Letter from James C. McKinney, Chief, Mass Media Bureau (Jan. 11, 1985) ("*Bureau Letter*"), J.A. at 158–59. Furthermore, the Bureau questioned the five-year consulting contracts between ACBC and two affiliates of Video Tape Systems, Inc., a Venezuelan-owned company that held a 24.04% interest in TBC and had the right to designate three out of the thirteen members of its board. Under these agreements, the consulting firms were to provide ACBC with comprehensive programming, production, and management services. *Id.* at 159–62. The Bureau concluded that these contracts would give aliens "substantial control of [the licensee's] programming, if not complete control." *Bureau Letter*, J.A. at 163.

In response, TBC brought its aggregate foreign ownership to below 25%. Letter from John P. Bankson, Jr., Counsel for TBC, to James C. McKinney (Feb. 11, 1985), J.A. at 168–69; amendment to FCC application filed by TBC on February 11, 1985 ("*TBC Amendment*"), J.A. at 172. In its amendment, TBC also stated that the contracts with the foreign consulting firms had been voided. *Id.* at 174.

The following month TBC advised the FCC through its attorneys that it had retained as consultants experienced Puerto Rican broadcasters who are American citizens to implement its plans. Others are available, including employees of existing television stations in Puerto Rico and Spanish language stations elsewhere in the United States. Letter from John P. Bankson, Jr., to James C. McKinney dated March 20, 1985 ("*March 20 Letter*"), J.A. at 190.

In its original application, TBC had proposed to operate WSUR–TV as a 100% satellite of WKBM–TV, which meant that none of the programming would originate locally in Ponce. *See Bureau Letter*, J.A. at 164. After considering whether the proposed arrangement would satisfy the satellite ownership exception, the Bureau advised TBC that the absence of any local programming made "exceedingly difficult the grant of the Ponce application without a hearing." *Id.* at 165. To meet this concern, TBC agreed to maintain a studio and offices, and to originate three to five percent of its weekly programming, in Ponce. *TBC Amendment*, J.A. at 176.

On July 26, 1985, the FCC granted the application as amended. *In re Zaida Perez Vda. de Perez Perry, et al. and Television Broadcasting Corp.*, FCC 85–381 (July 26, 1985) ("*Commission Decision*"), J.A. at 204. With respect to the issue of alien control, the Commission stated that

TBC has satisfactorily readjusted its alien ownership to comply with the statutory standard. Additionally, TBC has voided the questioned agreements and has, in fact, retained American citizens to provide the management services that

---

**3.** This section provides that

> (a) No license for [a] ... TV broadcast station shall be granted to any party ... if such party directly or indirectly owns, operates, or controls one or more broadcast stations in the same service and the grant of such license will result in:
>
>         \*      \*      \*      \*      \*      \*
>
> (3) Any overlap of the Grade B contours of the existing and proposed TV stations....

The term "Grade B contour[]" refers roughly to the area reached by a broadcasting station's signal as "computed in accordance with regulations promulgated by the Commission." *See* 47 U.S.C. § 522(10) (Supp.1986).

**4.** The Mass Media Bureau is the entity within the FCC to which the Commission, pursuant to 47 U.S.C. § 155(c)(1) (Supp.1986), has delegated the function of ruling on applications such as that at issue in this case.

were the subject matter of the voided contracts.

*Id.* at 206.

In reaching its conclusion that a satellite operation would serve the public interest, the FCC noted that the size of the Ponce market was well within the range of those on the mainland in which satellite service had previously been approved. *Id.* at 209. The Commission further stressed the poor economic situation of Ponce, noting that "it is questionable whether the Ponce facility could be operated independently ... when it has already failed as a satellite." *Id.* at 210. Citing this court in *LaRose v. FCC,* 494 F.2d 1145 (D.C.Cir.1974), the Commission also observed that it "must accord some weight" to the bankruptcy court's determination "that the sale of the two stations to a single buyer would increase the assets available to distribute to creditors." *Id.* Finally, while acknowledging that "independent ownership of the stations, if economically feasible, might lead to a greater diversity of choice," the Commission concluded that the transfer would serve the public interest as "the surest way to provide an additional choice of programming for the residents of the Caguas and Ponce areas." *Id.*

This appeal followed.

## II. ANALYSIS

### A. *Alien Control*

■ Title 47 U.S.C. § 310(b) of the Communications Act establishes a general policy against alien control of broadcasting facilities in the United States. To this end, the statute establishes percentage limitations on alien ownership, voting rights, and directorships. *Id.* These are the usual indicia of control or influence over a corporation's affairs. As the Commission is well aware, however, they may not always reflect operational reality. Thus, even in instances in which the technical statutory requirements are met, the Commission may still find that aliens exercise an effective control over the operations of a station that is contrary to statutory policy. *See, e.g.,*

*Channel 31, Debtor-in-Possession,* 45 R.R.2d (P & F) 420 (1979) (broadcast license transfer set for hearing on whether Canadian investors would hold *de facto* control); *Spanish International Communications Corp.,* 48 Fed.Reg. 28,549 (June 16, 1983) (statutory prohibition extends to *de facto* as well as *de jure* control).

■ Telemundo concedes that the alien ownership of TBC now falls within statutory limits. It contends, however, that the record will not support the FCC's finding that aliens will no longer exercise effective control over the television stations' operations. It is its position, in effect, that the rescission of the two consulting contracts represents a change of form rather than of substance. Video Tape Systems continues to own 24.04% of TBC's stock, its three Venezuelan nominees will continue to serve on its board, and TBC remains burdened by its original assertions that *only* the Spanish language broadcasting expertise represented by the Venezuelan owners could assure the future success of WKBM–TV and WSUR–TV. Therefore, in the absence of adequate safeguards or of specific evidence in the record to the contrary, the FCC must conclude (in Telemundo's view) that with or without contracts, the Venezuelan owners and their associates will play the dominant role in managing the two stations and in shaping their programs.

We see no reason to conclude that the Commission acted improperly or otherwise abused its broad discretion in finding that the problem of alien control had been satisfactorily resolved. The adjustments in stock ownership speak for themselves. As for the problem of *de facto* control, TBC stated in the amendment to its application that it had cancelled the contracts for management and programming services that had been the focus of the Bureau's concern. We have no basis for concluding that the Commission erred in accepting the implications of the wording of the contracts at face value, especially in light of the information that TBC had "retained as consultants experienced Puerto Rican broadcasters who are American citizens to imple-

ment its plans." *March 20 Letter*, J.A. at 191.[5]

Finally, as the Commission notes, "[i]f at any time after TBC begins operations, facts can be shown to raise a substantial question whether it is operating in a manner inconsistent with the statutory policy, that could be the subject of future Commission action." Brief for Appellee at 18 n. 22. *See* 47 U.S.C. § 312(a)(2). As the five-year license term for all television stations in Puerto Rico will expire on February 1, 1987, 47 C.F.R. § 73.1020(a)(3) (1985), applications for renewal of all Puerto Rico television licenses are due at the FCC no later than October 1, 1986. Thus, the FCC will have an early opportunity to reassess the matter of alien control on the basis of actual experience under the new management. *Id.* at § 73.3539(a) (1985).

### B. *Common Ownership*

■ FCC regulations generally prohibit common ownership of two television stations having overlapping reception areas. 47 C.F.R. § 73.3555(a)(3). The purpose of this rule is "to provide as many different sources of information as possible and to promote competition." *Coral Television Corp.*, 80 F.C.C.2d 323, 325 (1980).

The regulations permit an exception, however, when the FCC finds that it is in the public interest for one of the commonly owned stations to be operated as a satellite of the other. 47 C.F.R. § 73.3555 n. 5. While the appropriateness of "satellite" status, and therefore the propriety of common ownership, will be decided "on the facts of the particular case," *id.*, the Commission has consistently found that satellite authorizations are appropriate "where it appears that [satellite] operation would permit the flexibility in operation and the necessary economy to make feasible a television station which otherwise may not be constructed." *Authorization of UHF Sta-*

*tions Proposing No Local Programming*, 43 F.C.C. at 2734; *see, e.g., Meyer Broadcasting Co.*, 67 F.C.C. at 596.

While Telemundo concedes it is unlikely that Ponce could support an independent, full-service television station, it faults the Commission for having failed to consider the alternative possibility that WSUR–TV could have survived under independent ownership through a resort to rebroadcasting agreements—an arrangement whereby a station contracts to retransmit the programming of one or more other independently owned stations. Telemundo argues that such an arrangement would be feasible and would better advance the goals of the Commission's multiple ownership policy. As evidence of the idea's feasibility, it points to the interest expressed by intervenor WPRV–TV, Inc. in entering into a rebroadcasting arrangement with WSUR–TV. Telemundo concludes that the Commission's failure to examine this alternative was reversible error.

The Commission responds that at the time the application was under consideration

> no participant at the Commission suggested that it was prepared to engage in a retransmission agreement with WSUR–TV....
>
> Intervenor WPRV–TV, Inc., appearing for the first time in this appeal, suggests that it would be interested in a retransmission arrangement.... Had WPRV–TV, Inc. made its position known to the Commission in a timely manner, it might have provided useful information for the Commission to consider in its assessment of the public interest.... The Commission could hardly credit WPRV–TV, Inc.'s intentions when they were wholly unknown when the matter was under consideration.

We find, however, that this letter does not fit within the category of formal documents requiring signature by an officer. Furthermore, the information contained in the letter was not essential to the FCC's conclusion.

---

5. Telemundo argues that the March 20 letter by TBC's counsel was inadmissible under FCC regulations that state "[a]pplications, amendments thereto and related statements of fact required by the FCC" must be signed by officers of the applicant. 47 C.F.R. § 73.3513(a)(3) (1985).

Brief for Appellee at 23–24.[6] This reply does no more than state the obvious. The Commission cannot base its decisions on hypotheticals; it must rule on the facts before it. In this instance, the Commission had no evidence that there was a party available or willing to enter into a rebroadcasting agreement.

The Commission is under no obligation to seek out the ideal transferee for a broadcasting license. To the contrary, the Communications Act requires no more, in the case of a proposed transfer, than that the Commission find "that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d). Moreover, the FCC was under the added obligation to give consideration to this court's ruling, in *LaRose v. FCC*, that "in recognition of the public interest in protecting innocent creditors," the Commission should approve the most advantageous sale of a bankrupt's assets when such a transaction "will not unduly interfere with the FCC mandate to ensure that broadcast licenses are used and transferred consistently with the Communications Act." 494 F.2d at 1148.

It was the responsibility of the FCC to take all these factors into consideration as it addressed the issue of common ownership, and we have no reason to fault the manner in which it did so.

### III. CONCLUSION

Section 10(e) of the Administrative Procedure Act provides that a court may set aside an agency's "action, findings, and conclusions" only if it finds them to be "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. § 706(2)(A) (1977). This court may not substitute its judgment on the facts and substantive issues for that of the FCC. *Communications Investment Corp. v. FCC*, 641 F.2d 954, 972 (D.C.Cir.1981).

Given this standard of review, and given the careful consideration the Commission has devoted to all the issues properly before it, we find no basis for concluding that its disposition of the alien control and common ownership questions were in any respect arbitrary, capricious, or an abuse of discretion. The FCC's decision approving the transfer of television stations WKBM–TV and WSUR–TV to TBC is

*Affirmed.*

---

**6.** The FCC and TBC question the propriety of WPRV–TV's intervention. This court's recent decision in *Office of Communication of the United Church of Christ v. FCC*, 779 F.2d 702 (D.C. Cir.1985), reaffirms the principle that a party may intervene on appeal, despite a failure to do so during the agency proceedings, if other parties below raised the same arguments now pursued on appeal. *Id.* at 706–07.