WLOS TV, INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Mary R. Kupris, Executrix of the Estate
of Anthony R. Kurpis, and Cannell
Communications, L.P., Intervenors.

Nos. 90–1251, 90–1427.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 15, 1991.

Decided May 17, 1991.

William S. Reyner, Jr., with whom Katherine A. Schoff was on the brief, for appellant. Peter A. Rohrbach, Washington, D.C., also entered an appearance for appellant.

C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., with whom Robert L. Pettit, Gen. Counsel, Milan, Mich., and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., were on the brief, for appellee. Sue Ann Kanter, Atty., F.C.C., Washington, D.C., also entered an appearance for appellee.

Kevin C. Greene, Atlanta, Ga., was on the brief for intervenor Mary R. Kupris, Executrix of the Estate of Anthony C. Kupris, in No. 90–1251.

John Griffith Johnson, Jr. and John R. Feore, Washington, D.C., entered appearances for intervenor Cannell Communications, L.P., in No. 90–1251.

Before: MIKVA, Chief Judge, and WALD and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Concurring statement filed by Circuit Judge SILBERMAN.

MIKVA, Chief Judge:

Appellant WLOS TV, Inc. ("WLOS") sought permission from the Federal Communications Commission (the "FCC" or "Commission") to acquire the license of independent television station WAXA–TV

("WAXA"). WLOS hoped to operate WAXA as a satellite station, allowing WLOS to serve portions of the regional market its signal does not currently reach. The FCC denied an application for assignment of WAXA's license to WLOS, however, relying on the large degree of signal overlap between the two stations. WLOS appeals from that denial, claiming that prior Commission decisions mandate approval of its application. We conclude that the FCC's rationale for denying WLOS' application is inconsistent with agency precedent. Accordingly, we remand to the agency for further consideration of the application.

## I. BACKGROUND

WLOS and WAXA both serve a television market that includes the cities of Greenville and Spartanburg, South Carolina and Asheville, North Carolina. Mountains near Asheville bisect this market, blocking signals and causing "shadowing" and "ghosting" problems with television reception. WLOS is an ABC affiliate with its transmitter located in Asheville. As a result of the mountains, WLOS' signal does not reach Greenville or Spartanburg, which lie about fifty miles to the south. WLOS contended before the Commission that it suffers a competitive disadvantage in comparison to network affiliates that transmit from flatter ground in the Greenville–Spartanburg area because their signals can be received in Asheville as well as in southern parts of the market area. WLOS cannot relocate its transmitter to a position just south of the mountains because its signal would then be obstructed in Asheville, its community of license. Nor, WLOS stated, is it technically or economically feasible to improve reception in southern parts of the market by adding signal "boosters" or low-power "translator stations." *Mary R. Kupris*, 5 FCC Rcd 3828, 3828–29 (1990) [hereinafter *Kupris I*].

WAXA transmits from Anderson, South Carolina, just south of Greenville and Spartanburg. Mary R. Kupris ("Kupris"), intervenor in this case, now holds WAXA's license as executrix of her late husband's estate. Beginning in 1984, WAXA operated as an independent UHF station, sustaining substantial losses in the process. WAXA attributes these losses to competition with network affiliates and to the inability of WAXA's signal to reach Asheville. *Id.* at 3828.

After unsuccessfully seeking a buyer who would operate WAXA as an independent station, Kupris entered into an agreement with WLOS by which WLOS would purchase WAXA and operate it as "primarily a satellite" of WLOS. Stations of this type retransmit most of their parent's programs, but produce a small amount—less than five percent—of their programming locally. *See Suburban Broadcasting Corp.*, 83 F.C.C.2d 359, 360 (1980). This arrangement would allow WLOS to compete head-to-head with rival network affiliates in the Greenville–Spartanburg area. Furthermore, Kupris alleged that it was the only way to keep WAXA on the air. 5 FCC Rcd at 3828.

The FCC's "duopoly rule," forbidding common ownership of television stations with overlapping signals, stood in the way of this license assignment. *See* 47 C.F.R. § 73.3555(a)(3) (1990). However, Kupris and WLOS sought approval of the proposed assignment under the rule's "satellite exception," which provides that the duopoly restriction will not be applied where operation of a station as a satellite "would be in the public interest," as determined on a case-by-case basis. 47 C.F.R. § 73.3555 note 5. Pegasus Broadcasting of Augusta, Georgia, Inc., licensee of an ABC affiliate in Augusta, challenged the assignment, but subsequently withdrew its opposition.

In a decision released on April 11, 1990, the Commission appeared to approve the license assignment, determining that allowing WAXA to operate as primarily a satellite of WLOS would further the public interest. The next day, however, the Commission withdrew that decision as inadvertently released and substituted *Kupris I*, denying the exception. The Commission noted in *Kupris I* that rulemaking proceedings regarding satellite television stations

were pending, as they still are. *See* 5 FCC Rcd at 3831. Nonetheless, the Commission said that the WAXA license assignment "raises some very basic questions about our satellite policies that cannot be put off," and then stated that it would henceforth look principally to two factors, spectrum efficiency and the service needs of an area, when reviewing applications for satellite exceptions. *Id.* Applying these factors, the Commission found that a "very substantial overlap" existed between the signals broadcast by WLOS and WAXA and that neither Anderson nor the Greenville–Spartanburg–Asheville area is underserved by television. "In these circumstances," the FCC held, "the very significant spectrum inefficiency due to the large areas of signal duplication presented by the applicants' request is simply not outweighed by the service needs of the area." *Id.*

Kupris and WLOS sought reconsideration of the Commission's order, and WLOS appealed to this court. In a decision released on August 13, 1990, the Commission rejected the petition for reconsideration (delivered three minutes late) as untimely; in light of the pending judicial appeal, though, it addressed the claims made by Kupris and WLOS on their merits. *See Mary R. Kupris*, 5 FCC Rcd 5142 (1990) [hereinafter *Kupris II*]. The Commission backed away from the new policy announced in *Kupris I*, saying instead that the exception was not warranted under prior precedents. It stressed "the extreme degree of parent/satellite [signal] contour overlap the applicants proposed in this case," and specifically distinguished two prior decisions relied upon by the applicants. *Id.* at 5142. As in its April 12 decision, the Commission secondarily relied on the presence of several other television stations in the area, concluding that the assignment "would not further our longstanding goal of providing service to unserved or underserved areas." *Id.* Commissioner Duggan dissented in part, stating *inter alia* that the Kupris/WLOS application "falls comfortably within the range of existing satellite precedent." *Id.* at 5144.

WLOS appealed the second order, and that suit was consolidated with its appeal from *Kupris I*. Thus, challenges to both Commission orders are now before us.

## II. ANALYSIS

The Commission does not defend *Kupris I*, nor has it followed *Kupris I* in later decisions. However, the Commission does rest on the reasoning of *Kupris II*, saying that the decision not to grant a satellite exception in this case is consistent with prior agency practice and with subsequent administrative decisions. For its part, WLOS contends that the Commission's action in this case cannot be squared with decisions granting exceptions in similar circumstances.

### A. *Standard of Review*

■ The FCC notes that a party challenging the FCC's refusal to waive its rules "must show that the agency's reasons for declining the waiver were 'so insubstantial as to render that denial an abuse of discretion.'" *Thomas Radio Co. v. FCC*, 716 F.2d 921, 924 (D.C.Cir.1983) (quoting *Sudbrink Broadcasting, Inc. v. FCC*, 509 F.2d 418, 422 (D.C.Cir.1974)). Waiver cases are not on point, however, because the FCC's own regulations provide for exceptions to the duopoly rule and establish a standard—the public interest—by which satellite exception requests are to be measured. *See* 47 C.F.R. § 73.3555 note 5. Our task is to determine whether the Commission has applied that standard lawfully.

■ Where an agency departs from preexisting policy in an administrative adjudication, it must provide "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). If, however, an agency merely implements prior policy, an explanation that allows this court to discern "the agency's path" will suffice. *Hall v. McLaughlin*, 864 F.2d 868, 872–73 (D.C.Cir.1989) (quoting *Greater*

*Boston Television,* 444 F.2d at 851). To evaluate the sufficiency of the FCC's explanation in this case, we therefore must determine whether the Commission has, as it asserted in *Kupris II,* adhered to prior satellite exception precedents.

### B. *Consistency with Agency Precedent*

■ Commission decisions granting satellite exceptions historically have turned on an administrative finding that the community in which the satellite station was licensed could not (or would no longer) support a full-service television station. *See, e.g., W. Russell Withers, Jr.,* 2 FCC Rcd 3460, 3460 (1987); *B.G.S. Broadcasting, Inc.,* 2 FCC Rcd 107, 108 (1987); *Amaturo Group, Inc.,* 1 FCC Rcd 1020, 1021 (1986); *Laurel Television, Inc.,* 59 Rad.Reg.2d (P & F) 1337, 1340 (1986); *Pete J. Stathakas,* 59 Rad.Reg.2d (P & F) 169, 175 (1985); *Suburban Broadcasting,* 83 F.C.C.2d at 366–69 (1980); *Meyer Broadcasting Co.,* 67 F.C.C.2d 593, 595–97 (1978). These decisions typically considered the degree of signal overlap and the competitive effects of granting a satellite exception, but their central rationale was that a satellite station providing even a small amount of local programming advances the goals of broadcast availability, diversity, and competition better than no station at all. *See W. Russell Withers, Jr.,* 2 FCC Rcd at 3460; *Pete J. Stathakas,* 59 Rad.Reg. at 175; *Suburban Broadcasting,* 83 F.C.C.2d at 364–66; *Meyer Broadcasting,* 67 F.C.C.2d at 596–97. As this court noted in 1986: "[T]he Commission has consistently found that satellite authorizations are appropriate 'where it appears that [satellite] operation would . . . make feasible a television station which otherwise may not be constructed.' " *Telemundo, Inc. v. FCC,* 802 F.2d 513, 517 (D.C.Cir.1986) (quoting *Authorization of UHF Stations Proposing No Local Programming,* 43 F.C.C. 2734, 2734 (1954)).

Neither *Kupris I* nor *Kupris II* directly responded to the applicants' argument that WAXA would "go dark" unless operated primarily as a satellite. In *Kupris I* the Commission simply asserted that neither Anderson nor the Greenville–Spartanburg–Asheville market was "underserved." 5

FCC Rcd at 3831. Similarly, the FCC said in *Kupris II* that the proposed assignment would not further its "longstanding goal of providing service to unserved or underserved areas" because six commercial stations broadcast to Anderson. 5 FCC Rcd 5142. In *Kupris II,* though, the Commission also stated that the "extreme degree" of signal overlap that would result from conversion of WAXA into a satellite of WLOS differentiated the application before it from earlier successful applications. *Id.* As the Commission rested its effort to harmonize *Kupris II* with agency precedent on this reasoning, we examine the FCC's assertion in some detail.

The relevant technical measurement for determining signal overlap is the "Grade B contour," which "marks the approximate outer boundary for satisfactory off-the-air viewing under normal circumstances." *Tele–Media Corp. v. FCC,* 697 F.2d 402, 404 n. 4 (D.C.Cir.1983). An independent engineering study submitted to the Commission indicated that the Grade B contour of WLOS encompasses 17,816 square miles and a population of roughly 2.2 million people, while WAXA's Grade B contour encompasses 5,995 square miles and 952,000 people. The overlap of these two areas amounts to 4,360 square miles and about 840,000 people, which represents 24 percent of the area and 39 percent of the population within WLOS' Grade B contour and 73 percent of the area and 88 percent of the population within WAXA's Grade B contour. *Kupris I,* 5 FCC Rcd at 3828. The applicants disputed these calculations, asserting that they underestimated signal shadowing caused by mountains; Kupris and WLOS claimed actual area and population overlaps of 19 and 28 percent, respectively, for WLOS, and of 52 and 54 percent, respectively, for WAXA. *Id.* For purposes of *Kupris I,* the Commission accepted the applicants' lower overlap figures, *id.* at 3830, while it left the issue open in *Kupris II,* 5 FCC Rcd at 5142.

Whichever set of figures is used, the contour overlap that would have followed from approval of the Kupris/WLOS assignment is much greater than the overlap in

most instances where the Commission has approved satellite exceptions. Typically, satellite exceptions have been requested and granted where 1) the signal overlap between the parent and satellite amounts to a small fraction of the area and population served by the satellite station, *see, e.g., Mad River Broadcasting Co.,* 4 FCC Rcd 6456, 6457 (1989) (areas affected by overlap "would be small"); *Sidney T. Warner,* 3 FCC Rcd 4034, 4035 (1988) (Grade B overlap "not substantial"), or 2) the satellite would provide service to an unserved or underserved market, *see, e.g., Meyer Broadcasting,* 67 F.C.C.2d at 595–96 (21% area overlap approved where 13,863 viewers would receive first NBC service); *Amaturo Group,* 1 FCC Rcd at 1020 (19% area overlap approved where "all of Albion[, Nebraska] and much of Boone County would be without Grade B service" if satellite exception denied).

But not all satellite exceptions fit the above pattern; in those that do not, the economic viability of operating the proposed satellite as a full-service station was critical. Consider, for example, *B.G.S. Broadcasting,* in which the applicant sought to construct a satellite station in Kokomo, Indiana. Notwithstanding signal overlap amounting to 58 percent of the proposed satellite's potential audience and 41 percent of its Grade B signal area, and despite the availability of television signals from numerous regional stations, the Commission approved this application because "Kokomo will not support a full service television station." 2 FCC Rcd at 108.

Similarly, the FCC granted the exception sought in *Pete J. Stathakas,* where the applicant indicated that a proposed satellite on the edge of the Greenville–Spartanburg–Asheville market would have a Grade B area overlap with its parent amounting to 24 percent of the satellite's range, and a Grade B population overlap of 37 percent. Five other over-the-air stations and cable television could be seen in the satellite's home city of Greenwood, South Carolina, but the Commission found it dispositive that Greenwood could not support a full-service station. *See* 59 Rad.Reg.2d (P & F) at 174–75.

In *Suburban Broadcasting,* the Commission approved operation of a station on Long Island as a satellite of a Newark, New Jersey station. Even though both stations operated in the media-rich New York City market, the Commission disposed of the signal overlap issue in a few sentences, 83 F.C.C.2d at 365, 369–70, dwelling instead on the viability of the proposed satellite as a stand-alone station, *id.* at 365–69. Significantly, the FCC did not even translate the claimed signal overlap of 202 square miles and 1.7 million people into the percentage terms used in other decisions. *See id.* at 364.

Before *Kupris I* and *Kupris II,* then, the key factor in evaluating a requested satellite exception was whether or not the proposed satellite could survive if the exception was denied. This was true even where the Grade B contour overlap was relatively high in either area or population terms. While the Kupris/WLOS application presented the Commission with a higher degree of percentage overlap than in any case except *B.G.S. Broadcasting,* nothing in prior decisions suggested that this would preclude consideration of the applicants' contention that WAXA would shut down unless allowed to operate primarily as a satellite of WLOS.

Indeed, the *Kupris* opinions cannot even be squared with subsequent cases, in which the Commission has adopted a genuine balancing approach. In two recent decisions, the Commission said:

What constitutes a sufficient showing for an exception to the duopoly rule for a satellite operation has been established by case law and involves a balance of various factors, including the degree of overlap between the stations, the capacity of the market to support a full-service station, the level of service available in the market, the financial difficulties of the stations involved, as well as other considerations.

*Taft Broadcasting Co.,* 5 FCC Rcd 6988, 6991 (1990); *Family Group V, Ltd.,* 5 FCC Rcd 5547, 5549 (1990). This balancing approach contrasts with the FCC's virtually

exclusive concern for signal overlap in the *Kupris* decisions. For example, the FCC denied an exception in *Freedom Communications, Inc.* only after considering financial and other matters, even though the Grade B area and population overlaps would have been 67 and 68 percent of the satellite's totals—higher in percentage terms that the overlap at issue in the Kurpis/WLOS application. *See Freedom Communications, Inc.*, 5 FCC Rcd 7029, 7030 (1990); *see also Horseshoe Bay Centex Broadcasting Co.*, 5 FCC Rcd 7125, 7127–28 (1990) (approving satellite operation with "moderate" signal overlap under balancing approach).

We conclude that in *Kupris II* the Commission departed from the standards for considering satellite exception applications established in its prior decisions without providing the "reasoned analysis" mandated by our cases.

### III. CONCLUSION

The Commission failed to explain or even recognize its departure from agency precedent in *Kupris II*, and has neither defended nor followed *Kupris I*. We do not, however, order the FCC to approve the proposed license assignment. The Commission exercises "broad discretion in matters appertaining to licensing." *Listeners' Guild, Inc. v. FCC*, 813 F.2d 465, 469 (D.C. Cir.1987). This is particularly true in the context of satellite exceptions, where Commission rules provide for furtherance of "the public interest" on a case-by-case basis. 47 C.F.R. § 73.3555 note 5. Accordingly, we will afford the Commission an opportunity to reassess the Kupris/WLOS application. Should it determine on remand that a departure from relevant precedents is indeed warranted, the standards of reasoned decision-making established by our cases would require the Commission to justify its action. That justification might, of course, come via the ongoing rulemaking on satellite television stations. Alternatively, if the Commission again purports to act within the framework of prior cases, it should evince greater sensitivity to the reasoning of those precedents.

The Commission's decisions denying the application for assignment of WAXA's license are vacated, and the case is remanded to the agency for further consideration of the application. On remand, the Commission shall either adhere to governing precedents, or explain any departure from them with the requisite forthrightness and clarity.

*So Ordered.*

SILBERMAN, Circuit Judge, concurring:

I join the court's opinion and add the following thoughts. Neither the agency nor its counsel was able to suggest any reason why the public interest would be served by refusing to permit the transfer of the license and thereby putting the station off the air. After all the efforts to sell the station, it is patently obvious that there is no alternative use for the frequency. Appellant suggests that its client is the target of a personal grudge held by senior officials in the agency. Normally I would discount such a claim, but the agency's handling of this case is so inexplicable otherwise that appellant's suggestion is troubling. That explains why we would even consider ordering the FCC to grant the license.

I rather hope we do not see this case again.