# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 28, 2017       Decided November 17, 2017

No. 16-5314

GRANT MEDICAL CENTER, ET AL.,
APPELLANTS

v.

ERIC D. HARGAN, ACTING SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00480)

*Daniel C. Gibson* argued the cause for appellants. With him on the briefs was *James F. Flynn*.

*Weili J. Shaw*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Michael S. Raab*, Attorney.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: One of our sister circuits, the Sixth, ruled that the Centers for Medicare and Medicaid Services' (CMS) method for counting hospital beds conflicted with the plain language of the applicable regulation. CMS amended the regulation to permit its preferred counting method but—central to this case—applied the Sixth Circuit's interpretation to hospitals located within that circuit until the revised regulation took effect. Appellants, hospitals in the Sixth Circuit, challenge CMS' decision to acquiesce to the Sixth Circuit's ruling. Given that obeying judicial decisions is usually what courts expect agencies to do, the hospitals face an uphill battle. The district court found that the agency acted reasonably, and we agree.

## I.

Medicare reimburses hospitals for providing inpatient care through the Inpatient Prospective Payment System. 42 U.S.C. § 1395ww(a), (d). Under that system, Medicare pays hospitals a fixed amount for each patient regardless of the actual costs incurred. 42 C.F.R. § 412.2(a). In order to account for certain differences among hospitals, the reimbursement formula includes several supplemental adjustments. *See* 42 U.S.C. § 1395ww(d). Two such adjustments are at issue here: the Indirect Medical Education (IME) adjustment, which supplements payments to hospitals that train medical residents, *id.* § 1395ww(d)(5)(B), and the Disproportionate Share Hospital (DSH) adjustment, which supplements payments to hospitals that serve a disproportionate share of low-income patients, *id.* § 1395ww(d)(5)(F). Both adjustments turn, in part, on the number of inpatient beds at the hospital. Also, due to the particularities of the formulas, hospitals claiming the IME adjustment generally benefit when the bed count is lower, *see* 42 C.F.R. § 412.105, while hospitals claiming the DSH adjustment benefit when the bed count is higher, *see id.* § 412.106.

Under this "complex and highly technical regulatory program," *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)), counting beds is no simple matter. A hospital's bed count is calculated according to an intricate formula set forth at 42 C.F.R. § 412.105(b). Prior to October 1, 2003, that regulation provided:

> [T]he number of beds available in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

42 C.F.R. § 412.105(b) (2002).

At issue in this case are two types of beds occasionally used for inpatient care but unmentioned in section 412.105(b)'s express exclusions: "swing beds" and "observation beds." Swing beds, found primarily in small rural hospitals, change in reimbursement status depending on whether the facility is using the bed for acute care or skilled nursing care. *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 45,346, 45,418–19 (2003). Observation beds are short-term beds used for outpatient care when a patient has not been formally admitted to the hospital. *See id.* Even though section 412.105(b) did not expressly exclude swing or observation beds, the "longstanding policy" of CMS, which administers Medicare on behalf of the United States Department of Health and Human Services (HHS), was to

exclude these beds when calculating bed counts. *See id.*; Joint Stipulations ¶ 2.

In 2001, two Kentucky hospitals that fell short of the bed count needed to qualify for the DSH adjustment challenged CMS' interpretation of section 412.105(b). *See Clark Regional Medical Center v. HHS*, 314 F.3d 241, 242 (6th Cir. 2002). The hospitals argued that excluding swing and observation beds conflicted with section 412.105(b)'s plain text. In *Clark Regional Medical Center v. HHS*, the Sixth Circuit agreed, explaining that "[b]ecause the regulation specifically lists certain types of beds that are excluded from the bed count, but does not list swing or observation beds, the plain meaning of the regulation suggests that it is permissible to count swing and observation beds." *Id.* at 247.

In response to the Sixth Circuit's decision in *Clark*, CMS amended section 412.105(b) through notice-and-comment rulemaking to expressly exclude swing and observation beds. *See* Medicare Program; Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 27,154, 27,205–06, 27,229 (May 19, 2003) (notice of proposed rulemaking); 68 Fed. Reg. at 45,470 (final rule). CMS explained that, despite its longstanding policy of excluding swing and observation beds, "courts have applied our current rules in a manner that is inconsistent with our current policy and that would result in inconsistent treatment." 68 Fed. Reg. at 45,416 (discussing *Clark*). The effective date of the revised regulation was October 1, 2003. *Id.* at 45,346.

CMS has taken two additional actions relevant to the issue before us. First, to address reimbursement claims for patients discharged prior to the effective date of the revised regulation, the agency issued Joint Signature Memorandum 109 (JSM-

109). For hospitals located within the Sixth Circuit, CMS stated that it would comply with *Clark* and include swing and observation beds in the total bed count. But for hospitals located outside the Sixth Circuit, CMS maintained its policy of excluding swing and observation beds from the total bed count.

Second, in *St. Vincent Mercy Medical Center v. Blue Cross Blue Shield Association*, CMS Adm'r Dec., 2008 WL 6468508 (Nov. 17, 2008), CMS affirmed its commitment to follow *Clark* and JSM-109 for pre-October 2003 reimbursement claims at hospitals within the Sixth Circuit. In that case, an Ohio hospital challenged CMS' decision to comply with *Clark* and include observation beds when calculating total beds for purposes of the DSH adjustment. The Administrator rejected the claim, reasoning that "[g]enerally, when a court determines that an agency's interpretation is inconsistent with the language of the regulation, an agency may recognize that court's interpretation and apply the court's interpretation uniformly, thereafter, within the jurisdictional bounds of the interpreting court." *Id.* at *9. This approach, the Administrator explained, ensured that "all similarly situated providers are treated the same for the applicable cost reporting periods" and facilitated "the orderly administration of a complex and time sensitive program." *Id.* at *10. In the years following *St. Vincent*, CMS has continued to apply *Clark* to reimbursement claims for pre-October 2003 discharges filed by hospitals within the Sixth Circuit. *See, e.g.*, *Clinton Memorial Hospital v. Blue Cross Blue Shield Association*, CMS Adm'r Dec., 2010 WL 5570983, at *9 (July 26, 2010).

Appellants in this case are ten Ohio hospitals ("Hospitals") operating within the Sixth Circuit. For reasons we need not probe, the Hospitals would like swing and observation beds excluded from their total bed count when calculating

reimbursements for discharges prior to October 1, 2003. The Provider Reimbursement Review Board (PRRB)—the body responsible for initially hearing Medicare reimbursement disputes—rejected the Hospitals' claim. *See OhioHealth 2004 Clark Bed Days Group v. BlueCross BlueShield Association*, PRRB Dec. No. 2015-D1, 2015 WL 10739301, at *9 (Jan. 29, 2015). The PRRB explained that the "inclusion of observation bed days and swing bed days" for discharges prior to October 2003 "was correct . . . as all the providers are located within the Sixth Circuit and the *Clark* decision is controlling legal precedent." *Id.* The PRRB also noted that it "concurs with the Administrator in *St. Vincent* that the 'separation of powers doctrine requires administrative agencies to follow the law of the circuit whose courts have jurisdiction over the cause of action.[']" *Id.* at *8 (quoting *St. Vincent*, 2008 WL 6468508, at *9).

The Administrator declined to review the PRRB's decision, and it became final. *See* 42 U.S.C. § 1395*oo*(f)(1). Exercising their prerogative under a venue-choice provision, the Hospitals challenged the decision in the United States District Court for the District of Columbia. *Id.* (providing that an appeal "shall be brought in the district court of the United States for the judicial district in which the provider is located . . . or in the District Court for the District of Columbia"). The district court granted summary judgment in favor of the Secretary, *see Grant Medical Center v. Burwell*, 204 F. Supp. 3d 68, 71 (D.D.C. 2016), and this appeal followed.

"Because we apply the same standard of review as the district court, we proceed de novo, as if [the plaintiff] had brought the case here on direct appeal." *Tenet HealthSystems HealthCorp. v. Thompson*, 254 F.3d 238, 244 (D.C. Cir. 2001). Thus, we review CMS' decision under the Administrative

Procedure Act to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## II.

The Hospitals believe that we can disregard the acquiescence issue because CMS erred when it calculated bed counts under the pre-2003 version of section 412.105(b) rather than the revised version promulgated after *Clark*. Because the parties agree that the revised regulation would require excluding swing and observation beds—the Hospitals' preferred outcome—the Hospitals see this as the simplest path to relief. Unfortunately for the Hospitals, this simple solution runs into a simple problem: their case concerns reimbursement claims for discharges made *prior* to October 1, 2003, while the revised regulation applies only to "discharges occurring *on or after* October 1, 2003." 68 Fed. Reg. at 45,346 (emphasis added).

Undaunted, the Hospitals advance two arguments to circumvent this clear effective-date provision. Neither is convincing.

First, invoking the general rule that a "court is to apply the law in effect at the time it renders its decision," *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 711 (1974), the Hospitals argue that the PRRB should have applied the revised regulation because it was the law "in effect" when the Board rendered its 2015 decision. *See* Appellants' Br. 29. But under a contrary presumption, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988). Although our court has grappled with this "apparent

inconsistency in presumptions," *Gersman v. Group Health Association, Inc*., 975 F.2d 886, 889 (D.C. Cir. 1992), this ambiguity exists "only in the absence of statutory terms clearly directing the choice between retroactive and prospective application," *id.* at 888. Given that we apply a statute prospectively when "congressional intent is clear," *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 837 (1990), we see no reason why the principle should be any different when the agency's intent is clear in a regulation.

Next, the Hospitals contend that the PRRB should have applied the revised regulation retroactively because it "clarified" rather than "changed" the law and because the clarification inures to their benefit. This misses the mark in two respects. First, even if the revised regulation merely reiterates the law outside the Sixth Circuit, it still marks a "change" from the interpretation of section 412.105(b) that CMS had acquiesced to after *Clark* within that circuit until the revised regulation took effect. Second, the Hospitals have this circuit's retroactivity law backwards: while we have prohibited retroactive application of a rule that disadvantages a party by "effect[ing] a substantive change from the agency's prior regulation," *National Mining Association v. Department of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002), we never *require* agencies to apply rules retroactively even where it would be permissible for them to do so. *See Mountain Solutions, Ltd. v. F.C.C.*, 197 F.3d 512, 520 (D.C. Cir. 1999) ("Because rulemakings are generally prospective, there would appear to be no basis for the court to fault the Commission for failing to give [appellants] the benefit of its new rule." (citations omitted)). Had CMS decided to apply the revised regulation retroactively, it might have sought to justify that decision by presenting arguments similar to those advanced here by the Hospitals. But CMS chose to apply the revised regulation only

prospectively, and the Hospitals have given no reason to overturn that determination.

Focusing on the original bed-counting regulation, the Hospitals argue that even if the old rule applies, the Sixth Circuit's *Clark* decision can have no bearing on our analysis of whether CMS' interpretation of the regulation was arbitrary or capricious. Instead, they argue, having brought their case in this circuit, they are entitled to a ruling based on this court's independent review of the issue.

This mischaracterizes the question before us. To understand our task, we need look no further than the statute that gives us jurisdiction, 42 U.S.C. § 1395*oo*(f)(1), which states that "[p]roviders shall have the right to obtain judicial review of any final decision of the Board." In this case, then, we must determine whether the PRRB's final decision to follow *Clark* when calculating reimbursement claims for discharges prior to the revised regulation's effective date was "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with the law." *Sentara-Hampton General Hospital v. Sullivan*, 980 F.2d 749, 755 (D.C. Cir. 1992) (citing 5 U.S.C. § 706(2)(A) and (E)). In doing so, of course, we evaluate the reasons CMS gave for complying with *Clark*. But ignoring *Clark* altogether would require us to disregard the context and basis of the very decision we are reviewing. *See Independent Petroleum Association of America v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996) (holding that Department of the Interior's interpretation of a rule was unreasonable because it "constitute[d] an unexplained departure" from the agency's prior adoption of a Fifth Circuit decision).

We turn, then, to the issue at the heart of this case: whether CMS acted arbitrarily or capriciously when it decided to follow *Clark* by excluding swing and observation beds when calculating bed counts at the Hospitals' facilities.

The Hospitals argue that the PRRB's decision to acquiesce in this case was arbitrary and capricious because it relied on the faulty premise that the agency was required to follow *Clark*. According to the Hospitals, the only rationale the PRRB gave for following *Clark* was that "'the separation of powers doctrine requires administrative agencies to follow the law of the circuit whose courts have jurisdiction over the cause of action.[']" *OhioHealth*, 2015 WL 10739301, at *8 (quoting *St. Vincent*, 2008 WL 6468508, at *9).

Were this characterization of the PRRB's decision correct, we would have to reverse because, in this circuit, an agency need not always acquiesce to an adverse ruling. *See Johnson v. U.S. Railroad Retirement Board*, 969 F.2d 1082, 1093 (D.C. Cir 1992) ("Although the decision of one circuit deserves respect . . . 'it need not be taken by the [agency] as the law of the land.'" (quoting *Givens v. United States Railroad Retirement Board*, 720 F.2d 196, 200 (D.C. Cir. 1983))). Nonacquiescence may be particularly justified where, as here, it occurs in the context of a "broad venue statute [that] often forces the agency to act without knowing which circuit court ultimately will review its actions." *Id.* at 1091.

The Hospitals, however, take too narrow a view of the PRRB decision. Where "an agency merely implements prior policy," as CMS did here by following *St. Vincent*, "an explanation that allows this court to discern 'the agency's path' will suffice." *WLOS TV, Inc. v. F.C.C.*, 932 F.2d 993, 995 (D.C. Cir. 1991) (quoting *Hall v. McLaughlin*, 864 F.2d 868,

872–73 (D.C. Cir. 1989)). And here, the PRRB's repeated references to *St. Vincent* make the agency's path abundantly clear. *See OhioHealth*, 2015 WL 10739301, at \*8 (noting the argument that "Providers here are situated similarly to . . . St. Vincent Mercy Medical Center and that the Board should rule consistently with . . . the Administrator's decisions in *St. Vincent*"). Our task, then, is to determine whether CMS' incorporation of *St. Vincent* demonstrates that the agency properly understood it had no obligation to acquiesce to *Clark*.

Reading the PRRB's decision alongside the CMS Administrator's ruling in *St. Vincent*, we think it evident that CMS' view is not simply that it was required to acquiesce. *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738 (D.C. Cir. 2001) (holding that, although a court may not accept appellate counsel's post hoc rationalizations for agency actions, it may consider contemporaneous documents outlining the agency's reasoning). To be sure, the Administrator did state that "the separation of powers doctrine requires administrative agencies to follow the law of the circuit whose courts have jurisdiction over the cause of action," but the context reveals that the Administrator was merely describing the general disapproval of intracircuit nonacquiescence. *See St. Vincent*, 2008 WL 6468508, at \*9 n.21 (describing *Johnson*'s discussion of "true intra-circuit refusal of an agency to recognize adverse controlling case law" (citing *Johnson*, 969 F.2d at 1092)). Immediately after making this observation, the Administrator recognized that the principle of complying with adverse judicial rulings "is more problematic when an agency is faced with venue uncertainty." *Id.* at \*9. Nonetheless, the Administrator explained, CMS "*decided* to apply the JSM to ensure the orderly administration of a complex and time sensitive program and despite the venue uncertainty." *Id.* at \*10 (emphasis added). Considering both the PRRB's decision here and the Administrator's decision in *St. Vincent* that it relies

upon, we think it clear that CMS recognized its discretion not to follow *Clark* but made a reasoned decision to do so.

The Hospitals also argue that the PRRB acted arbitrarily and capriciously because it failed to give a rational explanation for treating hospitals in the Sixth Circuit differently from providers located elsewhere. Even if *Clark* constrained CMS' options for counting beds in the Sixth Circuit, the Hospitals believe that the better approach would have "treat[ed] [providers] similarly based on their common interests vis a vis the bed counting regulation (DSH versus IME)." Appellants' Br. 64. The Hospitals style this argument as both an arbitrary-and-capricious challenge and an equal-protection challenge. Appellants' Br. 15, 17. As they acknowledged at oral argument, however, these two versions are "fundamentally indistinguishable." Oral Arg. Rec. 14:17–:27. Accordingly, we consider these arguments together, reversing only if "'the agency offers insufficient reasons for treating similar situations differently.'" *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)); *cf. Ursack, Inc. v. Sierra Interagency Black Bear Gr*oup, 639 F.3d 949, 955 (9th Cir. 2011) (noting that where "no suspect class is involved" the "equal protection argument can be folded into the APA argument").

The mere fact that the Hospitals suggest an alternate approach hardly means that CMS acted arbitrarily or capriciously in choosing the approach it did. To the contrary, the existence of different law in different circuits provides a perfectly adequate reason for distinguishing between providers based on location. As this circuit's nonacquiescence case law establishes, once a court rejects an agency's interpretation of a regulation, the agency is not free to simply ignore the ruling

within that court's jurisdiction. *Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d 16, 22 (D.C. Cir. 2016) (noting that intracircuit nonacquiescence may constitute bad faith if not "clearly asserted and accompanied by a preservation of arguments for Supreme Court or en banc review"). Rather, the agency must choose between compliance or nonacquiescence and, if opting for the latter, it must "specify[] its arguments against adverse precedent" and seek further judicial review. *Id.* Given that seeking en banc review or certiorari after *Clark* was unrealistic—after all, CMS could correct the problem simply by revising the regulation—it is hardly surprising that the agency chose the former: acquiescing to the Sixth Circuit and promptly revising the regulation. In explaining its decision, the agency stated that complying with *Clark* would ensure that "all similarly situated providers are treated the same for the applicable cost reporting periods" and maintain "the orderly administration of a complex and time sensitive program . . . despite the venue uncertainty in PRRB cases." *St. Vincent*, 2008 WL 6468508, at \*10. Perhaps there were more elegant solutions to CMS' predicament, but our task is not to test whether the agency chose "the best solution, only a reasonable one." *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007).

As a final matter, although the Hospitals never squarely challenge the Sixth Circuit's reading of section 412.105(b), we emphasize that CMS' acquiescence would have been unacceptable had it rested on an unreasonable interpretation of the regulation. *See Holland v. National Mining Association*, 309 F.3d 808, 812, 819 (D.C. Cir. 2002) (rejecting agency's contention that acquiescing nationwide to an interpretation compelled by court order "cannot violate that 'not in accordance with law standard of the APA'"). We would be unable to sustain an administrative action that conflicted with the applicable statutory or regulatory text just because a sister

circuit has approved the interpretation or because the agency acts out of "administrative concerns, such as the desirability of uniformity." *Id.* at 818; *see also Atchison, Topeka & Santa Fe Railway v. Peña*, 44 F.3d 437, 446 (7th Cir. 1994) (cautioning against agency action seeking to ensure that the "applicable rule of law be settled [rather] than that it be settled right" (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting))), *aff'd sub nom. Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Railway*, 516 U.S. 152 (1996). That, however, is not the case here. As CMS explained when it first articulated its acquiescence decision in JSM-109, "[t]he regulations' text was silent" on the issue of counting swing and observation beds at the time of the *Clark* decision. Given this ambiguity, CMS believed that the Sixth Circuit's interpretation was permissible, even if not required, and we do as well.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to CMS.

*So ordered.*